## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **NEW DOMINION, LLC,** | ) | |
| | ) | |
| **Plaintiff/Consolidated Defendant,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 20-CV-0592-CVE-CDL** |
| | ) | <u>**BASE FILE**</u> |
| | ) | |
| **H&P INVESTMENTS, LLC,** | ) | **Consolidated with:** |
| | ) | **Case No. 21-CV-0504-CVE-CDL** |
| **Defendant/Consolidated Plaintiff.** | ) | |

## <u>OPINION AND ORDER</u>

Before the Court are plaintiff/consolidated defendant New Dominion, LLC's ("NDL") motion for partial summary judgment on legal expense[1] (Dkt. # 78), defendant/consolidated plaintiff H&P Investments, LLC's ("H&P") response and cross motion for partial summary judgment on legal expense (Dkt. # 83), and NDL's reply (Dkt. # 87). NDL requests that the Court enter judgment in its favor declaring that H&P has an obligation under the parties' contractual agreements to pay legal expense arising out of NDL's defense and prosecution of third-party earthquake and insurance litigation. H&P requests that the Court declare that it is under no contractual obligation to pay legal expense arising out of the NDL litigation in question. For the reasons set forth below, the Court denies plaintiff's motion for partial summary judgment, grants defendant's cross-motion for partial summary judgment, and declares that H&P is under no obligation to pay legal expense arising out of the earthquake and insurance litigation.

---

[1]     Although the parties' briefing uses the term "legal fees," the Court will refer to the contractual term of "legal expense," as it is defined more broadly than fees. <u>See, e.g.,</u> Dkt. # 69-1, at 107.

# I.

The following facts are undisputed in the summary judgment record:[2]

## A.    Relationship between NDL and H&P

NDL is an Oklahoma limited liability company that operates oil and gas wells in the state. Dkt. # 2, at 2.[3]  H&P is an Alabama limited liability company and a working interest owner in five NDL oil and gas well development projects.  Dkt. # 2, at 2, 6.  H&P acquired its interest in the five agreements and underlying oil and gas wells from New Source Energy Partners, LP and New Source Energy GP, LLC, (collectively, "New Source"), on April 1, 2017, pursuant to a bankruptcy court sale order.[4]  Dkt. # 83, at 5; Dkt. # 78-19.  The five agreements were not amended, nor were new contracts executed, to reflect the change in working interest ownership.

## B.    NDL's charged legal expense arising out of the underlying litigation

### 1.    Underlying earthquake litigation

Beginning in 2014, NDL was sued by Oklahoma landowners in a series of separate individual and class-action lawsuits.  Dkt. # 78, at 1, 4-6.  The lawsuits alleged that NDL's injection of wastewater into saltwater disposal wells caused earthquakes in and around Oklahoma, resulting in

---

[2]    The Court supplemented the undisputed material facts listed in the parties' partial summary judgment briefings with evidence from the summary judgment record to provide a more comprehensive overview of the procedural background and relevant contracts for the purposes of the underlying legal analysis.

[3]    All citations are to the CM/ECF header at the top of each page.

[4]    The bankruptcy court sale order was effective beginning April 1, 2017, but H&P's vice president, Jeanine Green, stated in a sworn affidavit that the purchase took place on or about July 20, 2017.  Dkt. # 85-1, at 2.

property and other damages.[5]   Dkt. # 78, at 4-6.   These petitioners identified NDL's

---

[5]     The Court has reviewed each attached underlying petition and summarizes the allegations therein as follows:

Plaintiffs in <u>Ladra v. New Dominion, LLC</u>, Case No. CJ-2014-115 (Lincoln County District Court) alleged that "[NDL] operate[s] wastewater injection wells in and around Lincoln County, Oklahoma, as well as other wastewater injection wells in central Oklahoma.  These injection wells have caused and contributed to numerous earthquakes occurring in and around Prague, Oklahoma, and caused the damages sustained by Mr. and Mrs. Ladra."  Dkt. # 78-6, at 4.

Plaintiffs in <u>Cooper v. New Dominion, LLC</u>, Case No. CJ-2015-24 (Lincoln County District Court) alleged that "over the past several years, thousands of earthquakes have occurred within the central portions of the state, which were only recently tied to the injection well operations of the [d]efendants."  Dkt. # 78-7, at 1.

Plaintiffs in <u>Depew v. Sundance Energy Okla., LLC</u>, Case No. CJ-2017-259 (Logan County District Court) alleged that "[NDL] operated and now continue to operate disposal wells . . . within the state of Oklahoma . . . to deposit [f]racking [w]aste into the natural environment. . . .The [d]isposal [w]ells . . . are the direct cause of earthquake clusters in and around Oklahoma City, Edmond, and other nearby communities in Oklahoma."  Dkt. # 78-8, at 12.

Plaintiffs in <u>Meier v. Chesapeake Operating, LLC</u>, Case No. CJ-2017-277 (Payne County District Court) alleged that NDL is one of "the largest operators and/or users of wastewater injection wells in the Arbuckle formation, and are the source of the fluids that have caused Oklahoma's earthquake swarm."  Dkt. # 78-9, at 10. "These injection wells have . . . proximately caused damages to [p]laintiffs and the putative [c]lass."  Dkt. # 78-9, at 20.

Plaintiffs in <u>Chacko v. Sundance Energy Okla., LLC</u>, Case No. CJ-2017-7308 (Oklahoma County District Court) alleged that NDL "alleged that "by carelessly locating and operating [its] individual [d]isposal [w]ells to deposit [f]racking [w]aste at or near geological faults, [NDL] failed to exercise reasonable and ordinary care to avoid the risk of injury and harm to others."  Dkt. # 78-10, at 15.

Plaintiffs in <u>Felts v. Devon Energy Prod. Co., LP,</u> Case No. CJ-2016-137 (Oklahoma County District Court) alleged that "[t]he use of the [d]isposal [w]ells by [NDL] created conditions which, among other things, are the proximate cause of unnatural and unprecedented earthquakes that continue unabated, increasing in both frequency and magnitude within Oklahoma County and elsewhere in the State of Oklahoma, which have damages [p]laintiffs and others and threaten to do so in the future."  Dkt. # 78-11, at 9.

Wishon, Chambers, Sweetheart, Deep Throat, Peyton, and Flower Power saltwater disposal wells as the source of the earthquakes.  See, e.g., Dkt. # 78-14, at 31; Dkt. # 78-10, at 18; Dkt. # 78-12, at 30.  NDL litigated these suits over the course of many years, and charged an apportioned amount of the legal and settlement expenses from the earthquake lawsuits to New Source, allegedly pursuant to the companies' five agreements governing the underlying oil and gas wells. Dkt. # 78, at 2.  After H&P acquired its working interest ownership in the five oil and gas agreements from New Source, NDL continued to bill H&P for the earthquake legal expense.  Dkt. # 85-9, at 15; Dkt. # 83-3, at 11.  The summary judgment record is silent as to the exact amount that NDL has charged H&P for these legal expenses, but it is estimated to exceed $600,000.  Dkt. # 83-3, at 7.

---

Plaintiffs in Griggs v. New Dominion, LLC, Case No. CJ-2017-137 (Oklahoma County District Court) alleged that "[historically, [NDL] has injected hundreds of thousands of barrels of wastewater into the Arbuckle each month through its disposal wells in the Luther area.  More specifically, its Peyton SWD and Wishon wastewater disposal wells have injected large volumes of waste into the Arbuckle.  Publicly available data reveals that these wells polluted the Arbuckle formation with fracking waste of about 20 million barrels or nearly 2.7 billion gallons of waste . . . and caused the earthquakes within the Luther Cluster." Dkt. # 78-12, at 30.

Plaintiffs in West v. ABC Oil Co., Inc., Case No. CJ-16-49 (Pottawatomie County District Court) alleged that NDL "operates wastewater injection wells in Pottawatomie County in which they inject huge volumes of wastewater under high pressures. These injection wells have caused the earthquakes occurring in and around Pottawatomie County."  Dkt. # 78-13, at 22.

Plaintiffs in Mallett v. Chesapeake Operating, LLC, Case No. CJ-2019-261 (Logan County District Court) alleged that "[t]he injection of produced water into earth is conduced by [NDL] on oil lands.  The disposal well drilling and injection of pressurized toxic water hat high volumes back into the earth is inappropriate in proximity to faults in Oklahoma County and surrounding counties." Dkt. # 78-14, at 25.

Plaintiffs in Bennett v. Chaparral Energy, LLC, Case No. CJ-2018-58 (Logan County District Court) alleged that the earthquakes in Oklahoma "were caused by [NDL's] operation of nearby wastewater inject[ion] wells. [NDL's] disposal of these substantial amounts of waste into the Arbuckle caused the earthquakes and damages to [p]laintiffs." Dkt. # 78-15, at 18.

## 2.     Underlying insurance litigation

The earthquake lawsuits prompted NDL to claim insurance coverage from its insurers of the earthquake legal expenses, which then spawned two additional lawsuits.  Dkt. # 78, at 6.   On September 16, 2016, National American Insurance Company ("NAICO") petitioned a district court in Lincoln County to enter a declaratory judgment regarding its coverage and duty to indemnify and defend NDL with respect to claims made in various lawsuits related to earthquakes.  Dkt. # 78-16, at 1.  In that petition, NAICO alleged that "each of the [e]arthquake [l]awsuits alleges that property damage has occurred as a result of earthquakes caused by [NDL's] disposal of what has been variously referred to as 'salt water', 'produced fluids', 'deleterious produced fluids', 'waste' and, generally other terms fitting the definition of 'pollutant' under [NDL] [p]olicies."  Dkt. # 78-16, at 3.  The summary judgment record is silent as to the outcome of that suit, but it appears that NDL was not successful in obtaining coverage of the earthquake legal expenses under the insurance policy.

On February 21, 2017, NDL filed a petition in state court against an Oklahoma insurance agent, alleging that the agent for NAICO was negligent and in breach of contract for failure to procure for NDL adequate insurance coverage.  Dkt. # 78-18, at 4. NDL stated in this petition that "[e]ach of [t]he earthquake lawsuits generally allege that New Dominion and other oil and gas companies have caused or contributed to cause earthquakes in Oklahoma as a result of the disposal or injection of waste water back into the ground."[6]  Dkt. # 78-18, at 2.  NDL claimed in its petition that "NDL specifically asked [the agent] if the NAICO policies would provide liability coverage for

---

[6]     NDL's current argument that, "all of the earthquake litigation arose out of well operations"–no doubt attempting to broadly equivocate H&P's working interest in oil and gas wells as proprietorship in the saltwater disposal wells–stands in contrast with this 2017 petition in which NDL states that the earthquake litigation arose out of its disposal of saltwater waste.  Dkt. # 78, at 2 (emphasis added).

earthquakes allegedly caused by the disposal or injection of wastewater into the ground." Dkt. # 78-18, at 3.  The summary judgment record is also silent as to the outcome of this litigation.

NDL proceeded to charge H&P for a share of its legal expenses arising from defense and prosecution of these insurance lawsuits.  NDL claims that litigation of insurance coverage affects the "joint property" of NDL and H&P.  At no point in time were New Source or H&P parties to the earthquake or insurance lawsuits.

### 3.      Parties' dispute over the legal expense

In 2019, the vice president of H&P, Jeanine Green, called NDL to inquire about the charged legal expense.  Dkt. # 78-21, at 1.  On October 9, 2020, and October 14, 2020, H&P wrote letters to NDL's general counsel and vice president, Fred Buxton, disputing the bills.  Dkt. # 9, at 4.  NDL insisted that charging the legal expense to H&P was permissible under the parties' participation and joint operating agreements, and on October 21, 2020, filed a state court petition[7] seeking a declaratory judgment as to whether it could properly charge H&P for certain legal expense pursuant to the aforementioned agreements.[8]  Dkt. # 2, at 7.  H&P removed the action to federal court on the basis of diversity jurisdiction.  Dkt. # 2.

### C.      Relevant contractual agreements

---

[7]      NDL filed a state court petition alleging that the amount in controversy did not exceed $75,000, despite Buxton's admission that the earthquake legal expense charged to H&P exceeds $600,000.  Dkt. # 83-3, at 7.

[8]      The underlying petition raised numerous legal and factual issues, prompting a nearly three-year discovery period.  In an effort to mitigate costs and expedite this case, the Court requested that the parties file a motion for partial summary judgment as to the earthquake legal expense, based on undisputed material facts in the record.

The five participation agreements and their respectively attached and incorporated joint operating agreements (JOAs) govern the parties' relationship and obligations to each other.  The respective agreements are summarized and restated, in relevant parts, as follows:

### 1.    Eight East Project

This oil and gas project relationship between the parties is comprised of the Eight East Amended and Restated Participation Agreement ("Amended PA"), the original Eight East Project Participation Agreement ("Original PA") and the incorporated JOA.[9]  Dkt. # 69-1, at 1.  The JOA is a standard AAPL Form-610, attached to the Original PA as "Exhibit B."

The Amended PA defines the relationship between New Source and NDL as working interest owner and operator, respectively, and reiterates that the purpose of the agreement is to "develop the oil and gas leaseholds by drilling oil and gas wells on leases within the area." Id.  The Amended PA does not contain a provision pertaining to legal expenses; however, Section V. General Terms and Conditions, subsection B. Payment of Costs and Expenses, outlines the costs apportioned among the parties.  This section has subsections, including:

> (2) Saltwater Disposal Cost and Infrastructure Cost  Each Participant agrees to pay its Proportionate Share of all actual costs incurred by Contract Operator relating to the disposal of saltwater attributable to the operation of each New Well[10] in which they participate. Participants also shall pay their Proportionate Share of infrastructure costs and well-related costs, which shall include, but not be limited to, certain necessary equipment, including, without limitation, tanks, pumps, drives, tubing, casing, pipelines, cables and other surface and electrical equipment. Participants shall also pay an additional ten percent (10%) of all Contract Operator's saltwater disposal

---

[9]    The Amended Participation Agreement modified the Original Participation Agreement because "a change in the [p]articipants [] and their respective [p]ercentage [i]nterests [] ha[d] taken place."  Dkt. # 69-1, at 1.

[10]    "New Wells" are defined as "wells drilled in the Project Area pursuant to this Participation Agreement."  Dkt. # 69-1, at 5.

costs and costs for infrastructure. Contract Operator shall keep an accounting of all saltwater disposal costs, infrastructure costs and will invoice Participants for such costs quarterly, with credit for all prepayments of such cost pursuant to Section III. Contract Operator shall reconcile prepayments made under this Section and actual infrastructure costs and well-related costs within the earlier of (i) the date when it is clear that there are or will be no material additional JIBS for any such infrastructure costs and well-related costs, or (ii) six (6) months of completion of any such infrastructure costs and well-related costs, and shall refund any overpayment to Participants within thirty (30) days ofthe reconciliation, but in no case more than six (6) months after prepayment is made. Other than with respect to Existing Infrastructure described in paragraph 4, below, Contract Operator shall charge and Participants shall not be obligated to pay any premium or mark-up for the cost of (i) constructing, (ii) operating or (iii) maintaining or repairing, in each case (the case of clauses (i), (ii) and (iii)) infrastructure and related equipment. The cost of constructing, operating and maintaining and repairing such infrastructure and related equipment will be billed to Participants at Contract Operator's actual cost and each Participant shall pay its Proportionate Share of such actual cost.

  a. Ownership of Infrastructure  Participants acknowledge and agree that they will not acquire ownership of saltwater disposal wells, pipelines, or equipment or other Infrastructure relating to saltwater disposal as a result of the payment of saltwater disposal costs, which shall remain the property of NDL.

Dkt. # 69-1, at 10 (emphasis added).  Section III. Budgets and Meetings, subsection B Quarterly

Budgets and Meetings, also provides, in part, that:

> With respect to construction and/or procurement costs for infrastructure, including saltwater disposal and infrastructure described in Section V.B. of this Participation Agreement, except as otherwise set forth in this Agreement, such construction and and/or procurement costs will be subject to all of the terms of Exhibit 'C' to the Joint Operating Agreement attached hereto as Exhibit 'B', as though such infrastructure was joint property and a joint operation as those terms are defined by such Joint Operating Agreement attached hereto as Exhibit 'B'.

Dkt. # 69-1, at 61.  Neither participation agreement contains provisions pertaining to legal expense;

however, the Amended PA incorporates the JOA in subsection E of the General Terms and

Conditions.  That provision states:

> NDL and each Participant hereby accept, adopt and ratify the terms and conditions of and, if not already executed, agree to execute the Joint Operating Agreement, designating NDL as Contract Operator and providing the terms and conditions under which the operations of the Wells and administration of the Project Area shall be carried out. . . . If any terms of the Joint Operating Agreement are in conflict with the terms and conditions of this Participation Agreement, then the terms and conditions contained in this Participation Agreement shall prevail as to the point in conflict.

Dkt. # 69-1, at 65.

The model form JOA has an attached exhibit that describes when the operator may charge legal expense.  Exhibit "C" to the JOA is the "Accounting Procedure."  The Accounting Procedure defines terms, outlines billing and audit procedures, sets overhead rates, and describes charges that can be made by the operator (NDL).  Section II Direct Charges lists a number of provisions that the "operator shall charge the joint account with," including:

> 10. Legal Expense.  Expense of handling, investigating, and settling litigation or claims, discharging of liens, payment of judgments, and amounts paid for settlement of claims incurred in or resulting from operations under the Operating Agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff, or fees [sic]. All other legal expense is considered to be covered by the overhead provisions of Section III. unless otherwise agreed to by the Parties, except as provided in Section I., Paragraph 3.

Dkt. # 69-1, at 107 (emphasis added).

### 2.    Boomtown Project

The Boomtown project consists of the Boomtown Participation Agreement (PA) and incorporated JOA.  The JOA is also a standard AAPL Form-610, attached to the PA as "Exhibit B."  The recitals page of the PA notes that "NDL operates certain oil and gas properties within the State of Oklahoma and owns certain infrastructure necessary for the production of oil and gas including but not limited to easements, grants of right of way, electrical distribution lines and saltwater

disposal facilities and gathering lines within T10 and T11 North, R5 East, Pottawatomie and Seminole

Counties, Oklahoma (the 'Project Area')."  Dkt. # 69-2, at 1.  It also notes that "NDL owns or has

a right to acquire certain assets, including, but not limited to oil and gas leasehold and drilling rights

within the Project Area, and desires to sell certain percentages of its available working interest within

certain areas in New Wells[11] within the Project Area as set forth in Exhibit 'A' (the 'New Wells').

As used herein 'Wells' shall mean the Existing Wells[12] and each New Well." Dkt. # 69-2, at 1.

---

[11]   "New Wells" are defined as follows: "Subject to the terms and conditions hereof and in accordance with the terms of the Operating Agreement, Participants agree to participate in the drilling, completion (or plugging and abandonment), equipping, and operations of New Wells to be located within the Project Area in accordance with their respective Proportionate Shares. Each New Well shall be drilled to a depth or formation, at a horizontal distance (if applicable), at a location, on an applicable drilling and spacing unit (provided any drilling or spacing unit other than a 320-acre unit must be mutually agreed upon by the Participants) with the estimated dry hole and completed well costs, and as otherwise specified on the Authorization for Expenditure ('AFE') as prepared and submitted by NDL to Participants pursuant to Paragraph II.A.4. The Participants acknowledge the AFE is an estimate and that they will be responsible for actual completed well (or dry hole) costs. Each New Well shall be drilled in accordance with the terms and conditions of the Operating Agreement." Dkt. # 69-2, at 2.

[12]   "Existing Wells." are defined as follows: "Each Participant's Proportionate Share in each Existing Well is set forth in Exhibit 'A'. The operation of each Existing Well shall be governed by the terms of an Operating Agreement in the form attached hereto as Exhibit 'B' (the 'Operating Agreement'), which shall supersede any prior Operating Agreements of the Existing Wells in any of the Project Area in wells operated by NDL in which Participants own an interest. NDL shall be designated operator under the Operating Agreement and the Contract Area under the Operating Agreement shall be limited to the Project Area. The Initial Well under each Operating Agreement is deemed to have been drilled. Any further activities on an Existing Well or the spacing unit allocated thereto shall be conducted as a subsequent operation under the Operating Agreement, including the drilling of any increased density well, or any reworking, deepening, recompleting or plugging back of the Existing Well (or any increased density well) within the spacing unit for such well." Dkt. # 69-2. At 2.

The PA does not contain a provision pertaining to legal expense; however, Section II

General Terms and Conditions,  subsection A  Payment of Costs and Expenses, outlines the costs

to be apportioned among the parties.  This section has subsections, including:

> 2. Saltwater Disposal and Infrastructure Costs:  Participants shall prepay, to NDL,
> their Proportionate Share of the Turnkey Saltwater Disposal costs attributable to each
> New Well for the purpose of acquiring saltwater disposal rights relative to the
> operation of each New Well in the amount of Three Hundred Thousand ($300,000)
> dollars. NDL reserves the right to increase this amount in increments of $25,000.00
> per well per year in the event of increased costs of drilling equipment and services
> on saltwater disposal wells and/or upon the discovery of productive Arbuckle
> formation when drilling the disposal well. In the event Saltwater Disposal Costs are
> increased, NDL will provide an accounting reflecting the reasons for the increase of
> Saltwater Disposal Costs upon written request of a Participant. Participants shall be
> responsible for their Proportionate Share of operational costs, upkeep, repair,
> replacement, maintenance and chemical treatment of disposal wells. Participants
> acknowledge that they will not acquire ownership of saltwater disposal wells,
> pipelines, or equipment relating to saltwater disposal as a result of the payment of
> saltwater disposal fees, which shall remain solely owned by NDL. All amounts due
> by each Participant pursuant to this Section II.A.2 shall be incorporated in the AFE
> for the applicable New Well and paid in accordance with the terms of the Operating
> Agreement.
>
> Each Participant also agrees to pay its Proportionate Share of oil, gas, water and
> electrical infrastructure installed as necessary by NDL for the Project Area. NDL will
> bill any amounts incurred for such infrastructure costs on a quarterly basis.
> Participants recognize that such infrastructure shall remain the property of NDL and
> they will have no ownership interest therein, beneficial or otherwise.

Dkt. # 69-2, at 3-4 (emphasis added).  The agreement also outlines (3) Advance Payment of

Project Costs, which states:

> 3. Advance Payment of Project Costs: From time to time, it may be necessary for
> NDL to purchase and install certain equipment, including, but not limited to pumps,
> drives, tubing, casing, pipelines, cables and other surface and electrical equipment
> ('Project Costs') in advance of drilling a New Well, for installation on an Existing
> Well or for installation on infrastructure and/or saltwater disposal wells .

Dkt. # 69-2, at 4.  While the PA does not contain a provision pertaining to legal expense, it incorporates the attached JOA in the General Terms and Conditions:

> D. Operating Agreement. NDL and each Participant do hereby accept, adopt, and ratify the terms and conditions of and, if not already executed, agree to execute that certain A.A.P.L. FORM 610-1989 MODEL FORM OPERATING AGREEMENT attached hereto as Exhibit "B", designating NDL as Operator and providing the terms and conditions under which the operations of the Wells and administration of the Project Area shall be carried out. The Operating Agreement shall be effective as of the Effective Date. . . . If any terms of the Operating Agreement are in conflict with the terms and conditions of this Participation Agreement, then the terms and conditions contained in this Participation Agreement shall prevail as to the point in conflict.

Dkt. # 69-2, at 6.  The model form JOA has an attached exhibit which describe how the parties may charge legal expenses.  Exhibit "C" to the JOA is the "Accounting Procedure."  The Accounting Procedure defines terms, outlines billing and audit procedures, sets overhead rates, and describes charges that can be made by NDL.  Section II Direct Charges lists a number of provisions that the "operator shall charge the joint account with," including:

> 10. Legal Expense. Expense of handling, investigating, and settling litigation or claims, discharging of liens, payment of judgments, and amounts paid for settlement of claims incurred in or resulting from operations under the Operating Agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff, or fees, or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III. unless otherwise agreed to by the Parties, except as provided in Section I., Paragraph 3.

Dkt. # 69-2, at 59-61 (emphasis added).

### 3.     Paden Project

The Paden project consists of the Paden Project Participation Agreement (PA) and attached JOA.  The JOA is also a standard AAPL Form-610, attached to the PA as "Exhibit F."  The Paden PA designates NDL as contract operator to drill and operate wells and infrastructure

in the Paden project area, and designates New Source as a working interest owner that receives a proportionate share of profits based on a well-by-well or unit-by-unit basis. Dkt. # 69-3, at 1; Dkt. # 69-3, at 3. The recitals listed on the first page of the PA note that "[c]ertain of the [p]arties hereto have acquired oil and gas leasehold and infrastructure in Townships 12 and 13 North, Range 5, 6, and 7 East (the 'Project Area') . . . [and] [t]he [p]arties desire to develop the oil and gas leasehold and infrastructure within the Project Area." Dkt. # 69-3, at 1. The second page of the PA notes that NDL owns existing infrastructure.[13] Exhibit "A" to the PA lists the existing NDL saltwater disposal wells: Wilzetta SWD, Cynthia 1 SWD, Pernicka 1 SWD, and Mazkoori 1 SWD.[14] Dkt. # 69-3, at 21-24.

The PA does not contain a provision pertaining to legal expense; however, Section V. General Terms and Conditions, subsection B Payment of Costs and Expenses, outlines the costs to be apportioned among the parties. This section has subsections, including:

2. Saltwater Disposal and Infrastructure Costs. Each Participant shall pay NDL its Proportionate Share of a disposal access fee of (i)three hundred thousand dollars

---

[13]   Existing NDL infrastructure is defined as "[i]nfrastructure, as defined below, to support wells in the Project Area and owned by NDL existing as of the [e]ffective [d]ate of this Participation Agreement, as set forth in Exhibit 'A.'" Dkt. # 69-3, at 2. "Infrastructure" is then defined as "collectively, all easements, rights-of-way, surface leases for saltwater disposal wells, electrical distribution lines, saltwater transport lines, saltwater disposal facilities, telecommunication and SCADA systems used to support saltwater disposal installed to support wells in the Project Area other than Gas Gathering Infrastructure described above." Dkt. # 69-3, at 3.

[14]   The Court notes that these saltwater disposal wells do not mirror those named in the underlying earthquake litigation petitions.

13

$300,000.00 for each New Well[15] in which it participates, or, (ii) in the event of an increased density well, then NDL's actual cost to hook the increased density well into the Infrastructure plus fifteen percent (15%). NDL may charge the Access Fee provided for in Section (i) of the preceding sentence for the next ten (10) New Wells drilled and completed after the date of this Agreement. As of the Effective Date, each Participant will pay its Proportionate Share of NDL's actual and documented repair, maintenance and costs of operations of Infrastructure to the extent said Infrastructure is used for wells in the Project Area as reflected by metered saltwater volumes and allocated between Existing Excluded Wells, Existing Included Wells, Increased Density Wells and New Wells. NDL will operate the Infrastructure and will invoice the Participants monthly for seven and one-half cents ($0.075) per barrel of saltwater flowing through all Infrastructure as an overhead fee for the cost of operating such Infrastructure. All Participants must unanimously approve any infrastructure expenditures in excess of two hundred fifty thousand dollars ($250,000). NDL shall meter volumes of saltwater and shall collect operating and overhead costs monthly by joint interest billing. <u>NDL shall own the Infrastructure, except for the Existing Participant Infrastructure.</u>[16]   Participants shall have a priority right to the Infrastructure.

Dkt. # 69-3, at 7 (emphasis added).  While the PA does not contain a provision pertaining to legal expense, it incorporates the attached JOA through the following provision:

NDL and each Participant hereby accept, adopt and ratify the terms and conditions of a form Joint Operating Agreement (Exhibit 'F'), designating NDL as Contract Operator and providing the terms and conditions under which the operations of the Wells and administration of the Project Area shall be carried out. The Participants shall enter into and execute a Joint Operating Agreement and associated Memorandum of Joint Operating Agreement for each Approved Buy Area and the Joint Operating Agreement shall be in the form included as Exhibit "F", and shall be updated as necessary. The Joint Operating Agreement shall be effective as of the

---

[15]   "<u>New Well(s)</u> shall mean the first well prospective of oil and gas drilled or acquired in a 640-acre spacing unit (or smaller unit if approved by unanimous vote of all the Participants) after the Effective Date of this Participation Agreement in the Project Area as defined below or any substitute for an approved New Well, excluding any Increased Density Well." Dkt. # 69-3, at 3.

[16]   The existing participant infrastructure "shall mean all infrastructure . . . to support wells in the Project Area not owned by NDL but owned by any of the Participants as of the Effective Date of this Participation Agreement, as set forth in Exhibit 'B.'" Dkt. # 69-3, at 2.  Exhibit B lists Coral 1-26 SWD and Marlow 1-14 SWD as existing participant infrastructure.  These saltwater disposal wells were also not mentioned in the earthquake litigation.

Effective Date. . . .If any terms of the Joint Operating Agreement are in conflict with the terms and conditions of this Participation Agreement, then the terms and conditions contained in this Participation Agreement shall prevail as to the point in conflict.

Dkt. # 69-3, at 11.  The model form JOA has an attached exhibit which describe how the parties may charge legal expenses.  Exhibit "C" to the JOA is the "Accounting Procedure."  The Accounting Procedure defines terms, outlines billing and audit procedures, sets overhead rates, and describes charges that can be made by NDL.  Section II Direct Charges lists a number of provisions that the "operator shall charge the joint account with," including:

10. Legal Expense.  Expense of handling, investigating, and settling litigation or claims, discharging of liens, payment of judgments, and amounts paid for settlement of claims incurred in or resulting from operations under the Operating Agreement or necessary to protect or recover the Joint Property and the cost of Operator's legal staff incurred in supervising such litigation and claims may be made.

Dkt. # 69-6, at 32 (emphasis added).[17]

---

[17]  NDL, in its motion for partial summary judgment, refers to the following settlement clause located in the body of the JOA, rather than the legal expense clause above. Dkt. # 78, at 3. The language of Article X of the Paden JOA provides:

Operator may settle any single uninsured third party damage or suit arising from operations hereunder if the expenditure does not exceed One Hundred Thousand Dollars ($100,000) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling, or otherwise discharging such claim or suit shall be a [sic] the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

Dkt. # 83, at 3 (emphasis added).  It is unclear why NDL has referred to this settlement

### 4.      Golden Lane Project

The Golden Lane project consists of the Golden Lane Participation Agreement (PA) and incorporated JOA.  The JOA is also a standard AAPL Form-610, attached to the PA as "Exhibit B."   This project covers the area "within T10, and T11 North, R5, R6, and R7 East, Pottawatomie, Okfuskee, and Seminole Counties, Oklahoma (the 'Project Area')."  Dkt. # 69-4, at 2.  The first page of the PA notes that "NDL owns . . . oil and gas leasehold and drilling rights within the Project Area, and desires to sell certain percentages of its available working interest within certain areas in New Wells within the Project Area . . . ."  Dkt. #69-4, at 2.  The PA does not contain any provisions pertaining to legal expense; however, similar to the foregoing subsections, designates saltwater disposal and infrastructure costs in Section II. General Terms and Conditions, subsection A. Payment of Costs and Expenses:

> 2. Saltwater Disposal and Infrastructure Costs: Participants shall prepay, to NDL, its Proportionate Share of the Turnkey Saltwater Disposal costs attributable to each New Well for the purpose of acquiring saltwater disposal rights relative to the operation of each New Well in the amount of Three Hundred Thousand ($300,000) dollars. NDL reserves the right to increase this amount in increments of $25,000.00 per well per year in the event of increased costs of drilling equipment and services on saltwater disposal wells and/or upon the discovery of productive Arbuckle formation when drilling the disposal well. In the event Saltwater Disposal Costs are increased, NDL will providing an accounting reflecting the reasons for the increase of Saltwater Disposal Costs upon written request of a Participant. Participants shall be responsible for their Proportionate Share of operational costs, upkeep, repair, replacement, maintenance and chemical treatment of disposal wells. Participants acknowledge that they will not acquire ownership of saltwater disposal wells, pipelines, or equipment

---

clause rather than the legal expense clause in Exhibit C to the JOA, which mirrors those in the other five agreements.  It is also unclear why NDL has referred to this settlement clause in only the Paden agreement, when all five JOAs contain similar settlement clauses. Perplexingly, NDL has made no further factual or legal arguments pertaining to this settlement clause. This clause, however, relates only to suits "arising from operations hereunder."  See generally III.A, infra.

relating to saltwater disposal as a result of the payment of saltwater disposal fees, which shall remain solely owned by NDL. All amounts due by each Participant pursuant to this Section II .A.2 shall be incorporated in the AFE for the applicable New Well and paid in accordance with the terms of the Operating Agreement.

Each Participant also agrees to pay its Proportionate Share of oil, gas, water and electrical infrastructure installed as necessary by NDL for the Project Area. NDL will bill any amounts incurred for such infrastructure costs on a quarterly basis. Participants recognize that such infrastructure shall remain the property of NDL and they will have no ownership interest therein, beneficial or otherwise.

Dkt. # 69-4, at 5 (emphasis added).  While the PA does not contain a provision pertaining to legal expense, it incorporates the attached JOA in subsection D of the General Terms and Conditions:

Operating Agreement.  NDL and each Participant do hereby accept, adopt, and ratify the terms and conditions of, and, if not already executed, agree to execute, that certain A.A.P.L. FORM 610-1989 MODEL FORM OPERATING AGREEMENT attached hereto as Exhibit 'B', designating NDL as Operator and providing the terms and conditions under which the operations of the Wells and administration of the Project Area shall be carried out. The Operating Agreement shall be effective as of the Effective Date. . . . If any terms of the Operating Agreement are in conflict with the terms and conditions of this Participation Agreement, then the terms and conditions contained in this Participation Agreement shall prevail as to the point in conflict. Upon execution of this Participation Agreement and the Operating Agreement, Participant agrees to execute the Memorandum of Operating Agreement in the form attached as Exhibit "I" to such Operating Agreement.

Dkt. # 69-4, at 8.

Similar to the aforementioned contracts, Exhibit "C" to the Golden Lane JOA, the Accounting Procedure, contains a provision pertaining to legal expense.  It provides in Section II, Direct Charges that "operator shall charge the Joint Account with the following items," including:

10. Legal Expense.  Expense of handling, investigating, and settling litigation or claims, discharging of liens, payment of judgments, and amounts paid for settlement of claims incurred in or resulting from operations under the Operating Agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff, or fees, or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be

17

covered by the overhead provisions of Section III. unless otherwise agreed to by the Parties, except as provided in Section I., Paragraph 3.

Dkt. # 69-4, at 71 (emphasis added).

### 5.    Luther Project

The Luther project has no controlling participation agreement; it consists only of a joint operating agreement.  The Luther JOA designates NDL as "operator" and the signatory parties as "non-operators."  Dkt. # 69-5, at 4.  The JOA states that "the parties to this agreement are owners of [o]il and [g]as [l]eases[18] and/or [o]il and [g]as [i]nterests[19] in the land identified in Exhibit 'A,'[20] and the parties have reached an agreement to explore and develop these [l]eases and/or [o]il and [g]as [i]nterests for the production of [o]il and [g]as to the extent and as provided for in this agreement."  Dkt. # 69-5, at 4.  The "[c]ontract [a]rea" is defined as "all of the lands, [o]il and [g]as [l]eases, and/or [o]il and [g]as [i]nterests intended to be developed and operated for [o]il and [g]as [p]urposes under this agreement. . . . such lands, [o]il and [g]as [l]eases and [o]il and [g]as [i]nterests are described in Exhibit 'A.'"  Dkt. # 69-5, at 4.

---

[18]    "Oil and gas lease[s]" are defined in the contract as "the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.  Dkt. # 69-5, at 5.

[19]    "Oil and gas interest[s]" are defined in the contract as "unleased fee and mineral interests in Oil and Gas in tracts of land lying within the Contract Area which are owned by parties to this agreement."  Dkt. # 69-5, at 5.

[20]    Exhibit "A" to the Luther JOA does not denote the "lands subject to this agreement."  Dkt. # 69-5, at 26.

Article XVI "Other Provisions" of the JOA states that "the provisions of this Article XVI shall control over all other provisions of this agreement, in the event the provisions are inconsistent." Dkt. # 69-5, at 33.  The contract lists out provisions including:

D.  This agreement is limited to Operations in the Contract Area in the Misener Hunton formation only unless specifically extended to other formations by written agreement of the Parties.

E. Saltwater Disposal Costs:

1.  Saltwater Disposal Costs: Each Party shall prepay to NDL, its Proportionate Share of the turnkey saltwater disposal costs attributable to each New Well for the purpose of acquiring saltwater disposal rights relative to the operation of each New Well in the amount of Four Hundred Thousand dollars ($400,000.00). This payment is a one-time fee for each New Well that, upon payment, entitles each Party to access to NDL's saltwater disposal system for the life of the New Well. ND L reserves the right to increase this amount in increments of Fifty Thousand Dollars ($50,000.00) per well per year in the event of increased costs of drilling equipment and services on saltwater disposal wells. In the event saltwater disposal costs are increased, NDL will provide an accounting reflecting the reasons for the increase of saltwater disposal costs upon written request of a Party. Each Party shall be responsible for their Proportionate Share of operational costs, upkeep, repair, replacement, maintenance and chemical treatment of disposal wells. Each Party acknowledges that it will not acquire ownership of saltwater disposal wells, pipelines, equipment relating to saltwater disposal or any byproducts of saltwater as a result of payment of saltwater disposal fees, which shall remain solely owned by NDL. All amounts due by each party Pursuant to this Section XVI.E.l shall be incorporated in the AFE for the applicable New Well and paid in accordance with the tem1s of the Operating Agreement.

2. Infrastructure Costs:  In addition to the saltwater disposal costs set forth in Article XVI.E.1, Parties also shall pay their Proportionate Share of NDL's infrastructure costs and well-related costs, including but not limited to the purchase and installation of pumps, drives, tanks, tubing, casing, pipeline networks, telecommunication networks including but not limited to SCADA systems, cables, and surface and electrical equipment deemed necessary by NDL to make hydrocarbons economic and marketable plus fifteen percent (15%).

Dkt. # 69-5, at 34 (emphasis added).  Similar to the aforementioned contracts, Exhibit "C" to the

JOA, the Accounting Procedure, provides that "Operator shall charge the Joint Account with the

following items," including:

> 10.  Legal Expense.  Expense of handling, investigating, and settling litigation or
> claims, discharging of liens, payment of judgments, and amounts paid for settlement
> of claims incurred in or resulting from operations under the Operating Agreement or
> necessary to protect or recover the Joint Property, including litigation costs of
> Operator's legal staff incurred in litigation. All other legal expense is considered to
> be covered by the overhead provisions of Section III. unless otherwise agreed to by
> the Parties, except as provided in Section 1., Paragraph 3.

Dkt. # 69-5, at 48 (emphasis added).

### 6.      Relevant terms common to all five agreements

The Accounting Procedure attached to each JOA defines "Joint Account" as "the account

showing the charges paid and credits received in the conduct of the Joint Operations and which

are to be shared by the Parties."  Dkt. # 83, at 6; Dkt. # 69-1, at 103.  It defines "Joint Operations"

as "all operations necessary or proper for the development, operation, protection, and maintenance

of the Joint Property." Dkt. # 83, at 7; Dkt. # 69-1, at 103.  It defines "Joint Property" as the "real

and personal property subject to the Operating Agreement to which this Accounting Procedure

is attached."  Dkt. # 83, at 7; Dkt. # 69-1, at 103.

While the JOA does not define the term "operation," it states, in the following provision:

"1. Proposed Operations. If any party hereto should desire to drill any well on the Contract Area[21]

---

[21]      "'Contract Area' shall mean all the lands, Oil and Gas Leases and/or Oil and Gas Interests
intended to be developed and operating for Oil and Gas purposes under this agreement.  Such
lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit 'A'." Dkt. # 69-
1, at 78.

other than the Initial Well[22] . . . [that party] shall give written notice of the proposed <u>operation</u> to

the parties who have not otherwise relinquished their interest in such objective."  <u>See, e.g.</u>, Dkt.

# 69-1, at 83 (emphasis added).  The JOA also states that "the party desiring to drill, Rework[23],

Sidetrack, Deepen[24], Recomplete or Plug Back such a well shall give written notice of the

proposed <u>operation</u> to the parties who have not otherwise relinquished their interest in such

objective."  <u>Id.</u> (emphasis added).

NDL claims that it charged H&P the earthquake and insurance legal expense pursuant to

the aforementioned legal expense clauses, contending that the earthquake litigation resulted from

"well operations" and affected "joint property."  Dkt. # 78, at 1.  H&P claims that NDL's

saltwater disposal system is not "joint property" and does not represent "operations" as

contemplated in the oil and gas agreements.  H&P also notes that it was never a party to the

underlying lawsuits and that it has no ownership interest in the saltwater disposal wells that

spawned the earthquake and insurance litigation.  As to the Boomtown and Golden Lane

agreements, H&P further argues that it never consented to legal charges for NDL's in-house legal

staff or outside counsel.

---

[22]    "Initial Well" and "well" refer to oil and gas wells, not saltwater disposal wells.

[23]    "The term 'Rework' shall mean an operation conducted in the wellbore of a well after it is
Completed to secure, restore, or improve production in a Zone which is currently open to
production in the wellbore. Such operations include, but are not limited to, well stimulation
operations but exclude any routine repair or maintenance work or drilling, Sidetracking,
Deepening, Completing, Recompleting, or Plugging Back of a well."  Dkt. # 69-1, at 78.

[24]    "'Deepen' shall mean a <u>single operation</u> whereby a well is drilled to an objective Zone below
the deepest Zone in which the well was previously drilled."  Dkt. # 69-1, at 78.

D.      **Energy Law Consultants billed as "outside counsel."**

To summarize the five agreements' legal expense provisions: two of the agreements (Paden and Luther) allow NDL, as the operator, to charge working interest owners for NDL's in-house legal staff or fees, subject to the other language in the provision; two other agreements (Golden Lane and Boomtown) distinguish charging for NDL's in-house legal staff or fees from those of outside counsel, and require consent from the working interest owners prior to charging for legal fees of either in-house or outside counsel; and one agreement (Eight East) does not allow NDL to charge for its in-house legal staff or fees, but presumably allows fees paid for outside counsel, subject to the other language in the provision.

As relevant here, many of the NDL invoices for "earthquake litigation" or "earthquake legal chgs" were charged as bills from vendors "New Dominion LLC", and "Energy Law Consultants."  Dkt. # 83-3, at 10-11; see e.g., Dkt. # 85-9, at 7, 12, 14.  Fred Buxton, the general counsel of NDL, owns and operates the company Energy Law Consultants, of which he is the sole employee.  Dkt. # 83-3, at 4; Dkt. # 83, at 8.  NDL employed Energy Law Consultants as "outside counsel" to assist with the earthquake litigation.  Dkt. # 83, at 8.  NDL then passed on these outside counsel charges to H&P when charging for earthquake litigation.  Buxton testified to the following in his sworn deposition in this case on January 18, 2023:

> Q: And I think we established earlier that Energy Law Consultants is a company that you own; is that correct Mr. Buxton?
>
> [Buxton]: That is correct.
>
> Q: And I see just on the face of these invoices it is a bill from Energy Law Consultants to New Dominion for - - under customer ID on the right-hand side it says 'Earthquake litigation.'

[Buxton]: Yes.

Q: Okay.  And is the time entries that are on those invoices, this is your time; correct?

[Buxton]: That's correct

Q: You're the only employee of Energy Law - -

[Buxton]: That's correct

Q: - -Consultants.  So you're paid a salary by New Dominion as general counsel; correct?

[Buxton]: That is correct.

Q: Okay. And then you are separately - - and I think you told me earlier part of your duties as general counsel was to advise on litigation, help manage litigation that New Dominion is involved in.

[Buxton]: That's correct.

Q: And so you're separately charging New Dominion for your time to manage some of that litigation at an additional hourly rate?

[Buxton]: Well, I don't - - first of all, I was being paid - - Energy Law Consultants was being paid by New Dominion to perform certain legal services.  And you're using the term 'manage.'  I mean, I was in the thick of these litigations.  I was actively litigating in these cases, and I was getting paid by New Dominion for doing that.

Q: Getting paid as general counsel or as a third-party consultant?

[Buxton]: As a third-party consultant, Energy Law Consultants.

Q: And you're passing those costs on to H&P?

[Buxton]: Yes, I am.

Q: So you're being paid twice?

[Buxton]: No. I'm being paid once.

Q: Well, you're being paid - -

[Buxton]: I'm paid a salary and then I'm being paid additionally as Energy Law Consultants.

[]

[Buxton]: I was being compensated by New Dominion by salary and by a second category was as Energy Law Consultants

Q: And through - -

23

[Buxton]: - - in addition.

Q: - - bonuses and overrides on certain wells?

[Buxton]: That's correct.

Q: And these sorts of activities, Mr. Buxton, of participating in calls with outside counsel, preparing people for deposition, looking at expert reports, aren't these activities that general counsel for companies do all the time?

[Buxton]: Not at the rate I was getting paid.  I was getting paid additionally.

Dkt. # 83-3, at 10-14**.**

## II.

### A.      Standard of Review

"A motion for partial summary judgment is resolved under the same standard as a motion for summary judgment." Doshay v. Glob. Credit Collection Corp., 796 F. Supp. 2d 1301, 1303 (D. Colo. 2011) (citing Franklin v. Thompson, 981 F.2d 1168, 1169 (10th Cir. 1992)).   Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 317.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87

(1986) (citations omitted).  In its review, the Court construes the record in the light most favorable

to the party opposing summary judgment.  <u>Garratt v. Walker</u>, 164 F.3d 1249, 1251 (10th Cir. 1998).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be

insufficient; there must be evidence on which the [trier of fact] could reasonably find for the

plaintiff." <u>Anderson</u>, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law."  <u>Id.</u> at 251-52.

An action for declaratory relief is appropriate to resolve contract disputes between parties.

"'In order to invoke the jurisdiction of the court under the declaratory judgments act there must be

an actual, existing justiciable controversy between parties having opposing interests, which interests

must be direct and substantial, and involve an actual, as distinguished from a possible, potential, or

contingent dispute.'" <u>Bristow First Assembly of God v. BP p.l.c.</u>, 210 F. Supp. 3d 1284, 1290 (N.D.

Okla. 2016) (quoting <u>Dean v. State of Okla. ex rel. Doak</u>, 292 P.3d 58, 62 (Okla. Civ. App. 2012)

(internal quotations omitted)).

**B.     NDL objection to H&P's combined response and cross-motion for summary judgment**

In its reply, NDL argues that H&P's combined response and cross-motion for summary

judgment is not permitted under local rule LCvR7(b).[25]  Dkt. # 87, at 3.  The Court recognizes that

_____

[25]     LCvR7(b) provides that "[i]t is not acceptable to file any combination of motion, response, reply, or supplemental brief."

local rules generally prohibit filing a motion and response in a single document.  However, the local

rule is a CM/ECF administrative rule for the dual purpose of clarity of the record and capture of

statistical data related to motion filing and pendency.  Further, this Court never intended to, and

cannot, deprive H&P of its right to file a motion for partial summary judgment under Rule 56 of the

Federal Rules of Civil Procedure. In the interest of expediting resolution of the legal issues, the

Court exercised its discretion to allow the combined motion and response.[26]

The Court nevertheless acknowledges that "cross motions for summary judgment are to be

treated separately; denial of one does not require the grant of the other." Buell Cabinet Co. v.

Sudduth, 608 F.2d 431, 433 (10th Cir. 1979).  However, "the relevant legal standard does not change

where the parties file cross motions for summary judgment." Spirit Bank Corp. v. Warner Aviation,

Ltd., No. 11-CV-81, 2012 WL 314201, at *4 (N.D. Okla. Feb. 1, 2012).  "'[I]f the granting of one

motion requires the denial of the other, the court need not delve into the other motion separately.'"

Grasso-Herlan v. Kijakazi, No. 20-CV-352-JFH-JFJ, 2021 WL 11669922, at *6 (N.D. Okla. Aug.

16, 2021) (citing Baker v. Brown, 479 F. Supp. 3d 1182, 1189 (W.D. Okla. 2020) (reversed in part

on other grounds)).  "To the extent the cross-motions overlap ... the court may address the legal

arguments together." Id.  NDL has had an opportunity to respond to H&P's arguments–in its reply

---

[26]     The Court acknowledges that it directed H&P to argue its motion in the form of a response,
rather than file a cross-motion for partial summary judgment. The Court requested in the
April 7, 2023 hearing that the issue be briefed efficiently, along with the other pending
motion for partial summary judgment regarding the PRSA fees.  Dkt. # 77, at 29.  After
setting the briefing timeline for that issue, the Court directed counsel for NDL and H&P to
draft one motion for partial summary judgment as to legal expense, limited to the legal issues
in the five agreements.  Dkt. # 77, at 33.  Again, it was never the intent to deprive H&P of
its rights under Rule 56.  In any event, the remedy for a violation of the local rule is for the
assigned judge to direct the court clerk to separate the motion and response into two separate
docket entry numbers.  For simplicity, the Court has elected not to do so in this case.

(Dkt. # 87)– pertaining to the charge of legal expense.  The Court will therefore consider H&P's response both a response and a cross-motion for partial summary judgment.

**III.**

"The JOA is a contract to be construed like any other agreement."  Pitco Prod. Co. v. Chaparral Energy, Inc., 63 P.3d 541, 545 (Okla. 2003).  Under Oklahoma law,[27] "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." OKLA. STAT. tit. 15, § 154.  "A contract must be considered as a whole so as to give effect to all its provisions without narrowly concentrating upon some clause or language taken out of context."  Lewis v. Sac & Fox Tribe of Okla. Housing Auth., 896 P.2d 503, 514 (Okla. 1994). "The terms of the parties' contract, if unambiguous, clear, and consistent, are accepted in their plain and ordinary sense, and the contract will be enforced to carry out the intention of the parties as it existed at the time the contract was negotiated."  Dodson v. St. Paul Ins. Co., 812 P.2d 372, 376 (Okla. 1991); see also OKLA. STAT. tit. 15, § 160.  "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . ." OKLA. STAT. tit. 15, § 155.  "Interpretation of contracts, and whether they are ambiguous, are matters of law for the court to determine."  Livesay v. Shoreline, LLC, 331 P.3d 1067, 1070 (Okla. Civ. App. 2001) (citing Osprey LLC v. Kelley Moore Paint Co., 984 P.2d 194 (Okla 1999)).

The parties disagree as to whether the contracts permit NDL to charge H&P the legal expense arising out of the underlying earthquake and insurance litigation.  See supra, n.5.  "The mere fact [that] the parties disagree or press for a different construction does not make an agreement

---

[27]     Each of the aforementioned contracts contains an Oklahoma choice of law provision.

ambiguous." <u>Pitco</u>, 63 P.3d at 545.  "A contract is ambiguous if it is reasonably susceptible to at least two different constructions.  <u>Id.</u>  In deciding whether a contract is ambiguous, courts consider the language in the entire agreement as a whole "so as to give effect to all its provisions."  <u>Id.</u>  "If a contract is complete in itself, and when viewed as a totality, is unambiguous, its language is the only legitimate evidence of what the parties intended."  <u>Id.</u>

The core of NDL's argument–articulated in a single page– is that "[a]ll of the [e]arthquake [l]itigation arose out of well operations [and] defending those cases was necessary to protect the property from claims, judgments, liens, and execution."  Dkt. # 78, at 8.  NDL further contends that "the [insurance] cases arose out of well operations, and both prosecuting and defending those cases in search of coverage or recompense for a lack of coverage was necessary to defend the property." <u>Id.</u>  H&P counters that the litigation "does not involve conduct arising out of 'operations under the Operating Agreement or necessary to protect or recover the Joint Property' and therefore cannot be charged to the Joint Account."  Dkt. # 83, at 9.  H&P reiterates that "[t]he lawsuits did not . . . implicate the production wells governed by the JOAs in which H&P does in fact own interests."  <u>Id.</u> at 10.

NDL charged H&P legal expense for litigation arising out of saltwater disposal well operations, and now claims the litigation is somehow related to the parties' unambiguous oil and gas drilling contracts.  As an initial matter, the underlying earthquake and insurance cases relate only to the injection of wastewater into saltwater disposal wells.  Each petition filed against NDL alleged damages pertaining to NDL's–and other oil and gas companies'–operation of saltwater disposal wells.  In no instance did the underlying petitions allege damages resulting from the operation of oil

and gas production wells.  NDL's attempt to broadly refer to those suits as those arising from "well operations" rather than those arising from the injection of wastewater is a crude attempt to conflate oil and gas wells with saltwater disposal wells, the latter of which NDL made clear in its agreements that H&P has no ownership interest.[28]

The determinative issue, then, is whether the contractual language is clear and explicit, and does not involve an absurdity.  The Court concludes that the terms of both the JOAs and PAs are unambiguous, clear, and consistent.  The Court finds that "operations under the Operating Agreement" refers only to oil and gas well operations, not to saltwater disposal well operations, and that charging H&P for the litigation arising out of NDL's saltwater injection was not "necessary to protect or recover the Joint Property" of the parties.  The Court so finds and concludes based on its legal interpretation of the following two clauses– (a) "operations under the Operating Agreement" and (b) "necessary to protect or recover the Joint Property."

**A.     "Operations under the Operating Agreement" is unambiguous and does not encompass saltwater disposal well operations**

The Accounting Procedure legal expense provision, common to all five agreements, provides that NDL may charge H&P for legal expense resulting from "operations under the operating agreement."  Though the parties analyze only the <u>participation agreements</u>, and neglect to analyze

---

[28]     Tellingly, working interest owners under the participation agreements at issue here were never sued or joined as parties in the underlying saltwater disposal well litigation.

the JOAs (the operating agreements), this provision requires the Court to first examine the main text of the JOAs to determine the definition of "operations."[29]

While the model form JOA does not define "operations" in its definitions subsection, a plain reading of the JOA text reveals that the term refers exclusively to oil and gas wells.  For example, the JOA states that a "party desiring to drill, [r]ework, [s]idetrack, [d]eepen, [r]ecomplete or plug back such a well shall give written notice of the proposed operation."  This is one of numerous instances wherein the JOA refers to "operation" as that related only to oil and gas well production.  NDL's injection of wastewater in NDL-owned saltwater disposal wells is never described as an "operation" under the JOA.    In fact, saltwater disposal wells are mentioned just once in the JOA, and referred to as merely "ancillary production facilities."  Dkt. # 69-1, at 87.  This language is clear and unambiguous; the term "operation," as contemplated by the JOA, refers only to those operations relating to oil and gas wells.

NDL implicitly acknowledges this in its reply brief; by arguing that "[o]perations under the Operating Agreement [] require the use of saltwater disposal wells"– and not that saltwater disposal wells are operations under the operating agreement–NDL has admitted that saltwater disposal wells are separate from operations under the Operating Agreement.  At issue is not whether saltwater

---

[29]    The definitions subsection of the JOA Accounting Procedure defines "Joint Operations" as "all operations necessary or proper for the development, operation, protection, and maintenance of the Joint Property."  However, the legal expense provision uses only the term "operations," and further constrains the term to "operations under the operating agreement."  "Joint Operations" is capitalized and used in numerous other provisions in the Accounting Procedure. See, e.g., Dkt. #  69-1, at 106 ("6. Transportation.  Transportation of employees and Material necessary for the Joint Operations, but subject to the following limitations.") The contract language therefore reflects that the parties intended for the term "operations," as used in the legal expense provision, to not mirror the term "Joint Operations," as defined in the Accounting Procedure.

disposal wells are a necessary ancillary component of oil and gas production; it is whether the earthquake and insurance litigation legal expense resulted from operations under the operating agreement. Cf. Cumberland Operating Co. v. Ogez, 769 P.2d 105, 108 (Okla. 1988). NDL's flowery argument that oil and gas operations "inexorably, inevitably, and inseparably" require the use of saltwater disposal wells is consequently irrelevant. Saltwater disposal well injections are not "operations" under the parties' JOAs.

NDL's skewed focus on the PA language and disregard of the JOA language exemplifies its attempt to obfuscate the plain language of a contract. The participation agreements control over the JOAs only when the terms and conditions of the participation agreements conflict with terms of the JOAs. There is no conflict between "operations" as used in the JOAs and "operations" as used in the participation agreements. In fact, the language of the participation agreements only reinforces the above interpretation of the term "operations under the operating agreement." Each PA incorporation provision requires the parties to "accept, adopt, and ratify the terms and conditions of the [JOA], designating NDL as Operator and providing the terms and conditions under which the operations of the Wells shall be carried out." See, e.g., Dkt. # 69-1, at 65 (cleaned up). This incorporation provision is clear and confines the term "operations" to oil and gas well production.

Assuming, *arguendo*, that the language of the PAs did control here, it is evident that the PAs are contracts to "develop the oil and gas leaseholds by drilling oil and gas wells." See, e.g., id. at 1. The participation agreements extensively outline the drilling schedule, working interest ownership percentages, and fees for new oil and gas wells. The attached exhibits list oil and gas wells by name, location, and project area. See, e.g., Dkt. # 69-1, at 53-56. The contracts require H&P to pay a

portion of saltwater disposal costs incurred by NDL, but clearly and unambiguously provide that the disposal wells themselves remain the sole property and responsibility of NDL.  See infra III.B. Saltwater disposal wells are merely one of many peripheral fees that participants must pay.  The participation agreements are not disposal agreements; they establish a working interest relationship for developing oil and gas leaseholds.

NDL, ignoring the plain language of the JOA and overlooking all relevant language in the participation agreements, nevertheless argues that the PAs incorporate saltwater disposal wells into its definition of "joint operation[s]" and "joint property."  Dkt. # 87, at 5.  NDL quotes a section of the Eight East Amended PA supporting this point, and argues that "'infrastructure, including saltwater disposal' shall be subject to the terms of Exhibit C [the Accounting Procedure] to the Joint Operating Agreement 'as though such Infrastructure was joint property and a joint operation as those terms are defined' under the attachments." Id.  This selective splicing of contract language is a gross misrepresentation of the provision.  That provision, which is quoted in its entirety in Part I.C.1. of this opinion, states:

> [w]ith respect to construction and/or procurement costs for infrastructure, including saltwater disposal and infrastructure [] such construction and and/or procurement costs will be subject to all of the terms of Exhibit 'C' [the Accounting Procedure] to the Joint Operating Agreement attached hereto as Exhibit 'B', as though such infrastructure was joint property and a joint operation as those terms are defined by such Joint Operating Agreement attached hereto as Exhibit 'B.'

Dkt. # 69-1, at 61 (emphasis added).  NDL's argument is an attempt not only to pervert the meaning of this provision, but also to improperly attribute the language's existence to all five agreements. The above provision is present only in the Eight East Amended PA; the language is not found in the

Boomtown, Paden, Golden Lane, or Luther agreements.   Regardless, this provision exclusively references saltwater disposal "as though such infrastructure was joint property and a joint operation" with respect to construction and/or procurement costs.  If the contracted parties had intended for saltwater disposal wells to be joint operations or joint property for legal expense in the Eight East Amended PA, the contract language would have reflected this broader intention.  This provision adds nothing to the analysis of the terms "joint operation[s]" or "joint property."[30]  The Court concludes that "operations under the Operating Agreement" is clear, unambiguous, and does not encompass saltwater disposal well operations.

> **B.     Charging H&P for earthquake and insurance litigation arising out of NDL's saltwater disposal well operations is not necessary to protect or recover the Joint Property**

The Accounting Procedure legal expense provision provides, in addition to the aforementioned clause, that NDL may charge H&P for legal expense "necessary to protect or recover the Joint Property."  "Joint Property" is defined in the Accounting Procedure as the "real and personal property subject to the Operating Agreement to which this Accounting Procedure is attached."  See, e.g., Dkt. # 69-1, at 103.  NDL argues that under the controlling participation agreements, saltwater disposal wells are joint property or necessary to protect or recover joint property.  The language of the participation agreements plainly contradicts this interpretation.

---

[30]     Moreover, the legal expense clause in the Accounting Procedure does not utilize the term "joint operation;" rather, it allows legal expense for "operations under the operating agreement." See fn.29.

The participation agreements expressly provide that H&P has no ownership interest in the saltwater disposal wells.  The agreements are <u>conditioned</u> on the parties' recognition that the saltwater disposal wells "shall remain the property of NDL and [H&P] will have no ownership interest therein, beneficial or otherwise."  Dkt. # 69-2, at 3-4.  This is reinforced further: "[H&P] acknowledge[s] that [it] will not acquire ownership of saltwater disposal wells, pipelines, or equipment relating to saltwater disposal as a result of the payment of saltwater disposal fees, which shall remain solely owned by NDL."  <u>Id.</u>  In fact, in two of the agreements, the Accounting Procedure notes that NDL "shall be responsible for the <u>proper</u> disposal of saltwater as may be necessary for the operation and production of the unit well(s)."  <u>See, e.g.</u>, Dkt. # 69-2, at 61; Dkt. # 69-4, at 71 (emphasis added).  NDL cannot apportion legal expense to H&P for litigation arising out of disposal well operations in which it has no ownership or control.  NDL is solely responsible for damages resulting from its disposal well operations, including legal expense.[31]

Notwithstanding the clear language of the contracts,  NDL doubles down in its reply brief and argues that "any litigation that arises out of or seeks to end operations under the Operating Agreement satisfies the 'operations under the Operating Agreement' test . . . [a]nd resisting efforts to forbid, via injunction, punitive damages, or declaratory judgment, a court order prohibiting [NDL]

---

[31]     It is particularly troublesome that NDL has apportioned legal expense to H&P for litigation arising out of saltwater disposal wells that are not mentioned in the parties' contracts.  Nearly every petition that NDL has produced alleges damages arising out of NDL's injections into the Wishon saltwater disposal well, and a few have alleged damages resulting from injections into the Chambers, Sweetheart, Deep Throat, Peyton, and Flower Power disposal wells.  These particular wells are not mentioned in the agreements between NDL and H&P.  And, there is no evidence in the record that the oil and gas operations subject to the five agreements even produced the wastewater that was injected into the mentioned disposal wells.

from <u>using</u> joint property is 'necessary to protect or recover the Joint Property." Dkt. # 87, at 5. NDL argues, essentially, that litigating these cases was necessary to protect or recover the joint property because it was necessary to dispose of saltwater produced in the operation of the joint property.  This argument is baseless; NDL can dispose of saltwater elsewhere.  H&P has no working interest in the saltwater disposal wells.  The saltwater disposal wells are ancillary to the operations under the agreements; they are not joint property.

This argument that the litigation arising out of its own saltwater disposal operations –which legal expenses include the NDL general counsel expenses in his roles as both general counsel and as outside counsel–was "necessary" to "protect" the "joint property" borders on frivolous.  Beyond the apparent fact that the "joint property" consists of oil and gas operations, there is no injunction or court order to support the argument that NDL's litigation protected or recovered the parties' oil and gas joint property.   Moreover, NDL fails to explain how unsuccessfully defending and prosecuting insurance cases for coverage of property damage under policies in which H&P is not an insured, nor an owner of the property, was necessary to protect or recover the Joint Property.  NDL's insurance litigation, arising out of its separate saltwater disposal well operations, is entirely unrelated to H&P.  In conclusion, NDL fails to allege facts supporting its argument that–had it not incurred the earthquake and insurance litigation legal expense–the parties' joint property would not have been protected or recovered.

## IV.

The Court finds and concludes as a matter of law that the contracts are unambiguous.  The language of the contracts is clear and explicit, and the parties' intent plainly ascertainable.  Accepted

in their plain and ordinary sense, the terms of the participation agreement provide that NDL is the sole owner of the saltwater disposal wells.  It is clear that these disposal wells are not joint property. Moreover, the saltwater disposal well injections undertaken by NDL are not "operations under the operating agreement" as the term is used in the JOAs.  Therefore, the Court finds and concludes that the contracts do not permit NDL to charge H&P for the legal expense arising out of its earthquake and insurance litigation.[32]

NDL's motion for partial summary judgment as to legal expense should be denied, and H&P's cross-motion for partial summary judgment as to legal expense should be granted.  The Court declares that damages should be awarded to H&P in the full amount of the charged legal expense. The parties shall confer in an attempt to resolve the amount of such recovery, plus payment interest.

**IT IS THEREFORE ORDERED** that plaintiff/consolidated defendant NDL's motion for partial summary judgment on legal expense (Dkt. # 78) is **denied.**

**IT IS FURTHER ORDERED** that defendant/consolidated plaintiff H&P's cross motion for partial summary judgment on legal expense contained within its response (Dkt. # 83) is **granted**.

**IT IS FURTHER ORDERED** that the parties shall file a joint chart of the legal expense charged to H&P no later than **January 19, 2024.**

**DATED** this 19th day of December, 2023.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

---

[32]     The Court need not reach the issue of consent.  Because the Court has found that the legal expense did not result from operations under the Operating Agreement or was necessary to protect or recover the Joint Property, it is immaterial whether H&P's consent was required to apportion said legal expense. See Dkt. # 87, at 6.