UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

NEW DOMINION, LLC,                          )
                                            )
                Plaintiff/Consolidated      )
                Defendant,                   )
                                            )
v.                                          )       Case No. 20-CV-0592-CVE-CDL
                                            )       BASE FILE
                                            )
                                            )
H&P INVESTMENTS, LLC,                       )       Consolidated with:
                                            )       Case No. 21-CV-0504-CVE-CDL
                Defendant/Consolidated      )
                Plaintiff.                   )

## OPINION AND ORDER

Before the Court are plaintiff/consolidated defendant New Dominion, LLC's (NDL) motion

for partial summary judgment on the propriety of the Oklahoma Production Revenue Standards Act

(PRSA)[1] fees it charged defendant (Dkt. # 80), defendant/consolidated plaintiff H&P Investments,

LLC's (H&P) response and cross motion for partial summary judgment on the impropriety of the

PRSA fees it was charged (Dkt. # 85), and NDL's reply (Dkt. # 88).  NDL requests that the Court

enter judgment in its favor declaring that it may charge H&P under the PRSA for maintenance fees

it incurred.  H&P requests that the Court declare that it is under no contractual or statutory obligation

to pay PRSA fees because the fees were assumed by private agreement.  For the reasons set forth

below, the Court denies plaintiff's motion for partial summary judgment, grants defendant's cross-

motion for partial summary judgment, and declares that NDL may not charge H&P maintenance fees

under the PRSA based on the unambiguous terms of the parties' contracts.

---

[1]         The PRSA is codified at Okla. Stat. Ann. tit. 52, § 570.1, et seq. (West 1992).

# I.

The following facts are undisputed in the summary judgment record:[2]

## A.     Statutory language of the PRSA

The PRSA regulates the marketing, sale, and production of oil and gas in the state of Oklahoma.  Dkt. # 85, at 21; Okla. Stat. Ann. tit. 52, § 570.1, et seq. (West 1992).  The PRSA creates mechanisms for timely royalty accounting and remittance, and prevents operators from neglecting to pay timely proceeds to royalty owners when taking advantage of high interest rates. Okla. Stat. Ann. tit. 52, § 570.1, et seq. (West 1992).  In exchange for managing royalty remittance, the operator of wells can offset administrative costs by assessing fees to working interest owners.

Subsection 13 of the PRSA provides that:

> The Corporation Commission shall promulgate rules, as needed, in furtherance of the purposes of the Production Revenue Standards Act, including but not limited to a schedule of equitable fees and expense reimbursements from working interest owners sufficient to cover the actual costs incurred by the operator to perform duties required by the Production Revenue Standards Act not assumed by private agreement.

Okla. Stat. Ann. tit. 52, § 570.13 (West 1992) (emphasis added).

## B.     NDL's charged PRSA fees and overhead rate

---

[2]     The Court has already outlined the parties' relationship in its prior opinion (Dkt. # 90):

> NDL is an Oklahoma limited liability company that operates oil and gas wells in the state. H&P is an Alabama limited liability company and a working interest owner in five NDL oil and gas well development projects. H&P acquired its interest in the five agreements and underlying oil and gas wells from New Source Energy Partners, LP and New Source Energy GP, LLC, (collectively, "New Source"), on April 1, 2017, pursuant to a bankruptcy court sale order.  The five agreements were not amended, nor were new contracts executed, to reflect the change in working interest ownership.

Dkt. # 90, at 2.

2

Since April 2018, NDL has charged H&P for "PRSA Mtnc Fees" on wells in the contract area subject to the parties' agreements. Dkt. # 85, at 15; Dkt. # 88, at 3. NDL claims it has authority to charge PRSA maintenance fees under the PRSA, Okla. Stat. Ann. tit. 52, § 570.13 (West 1992), and Okla. Admin. Code § 165:10-27-10 promulgated thereunder, the latter of which "prescribes fees which may be charged [to working interest owners] by the operator of a gas producing well [] for administrative expenses generated by the [PRSA]." Okla. Admin. Code § 165:10-27-10. NDL contends that the PRSA requires NDL to perform revenue accounting and royalty disbursement services for its working interest owners. Dkt. # 80, at 14-15, 17. NDL alleges that, because it incurs administrative costs for performing these services, it may charge H&P a maintenance fee in accordance with the PRSA statutory fee schedule.[3] Id. at 11. NDL alleges that "revenue accounting and royalty disbursement aspects of NDL's services are such that a single, full-time employee, [La Donna Peacock], dedicates her entire position to the task and two additional employees have to assist her in the job."[4] Id.

NDL allegedly charges H&P these PRSA maintenance fees in accordance with the statutory fee schedule, which permits an annual maintenance charge of $450 per well. See Okla. Admin. Code § 165:10-27-10, Appendix G. NDL's corporate representative estimates that among its five contracts,

---

[3]     Okla. Admin. Code § 165:10-27-10(e) provides that:

> [a]n annual maintenance fee shall cover any cost associated with record keeping, issuance of gas balancing statements and any election of a producing owner regarding separate distribution of royalty proceeds. Maintenance fees shall be calculated on an annual basis using the first day of May as the anniversary date. Such fees may be prorated and billed on a monthly basis at the well operator's discretion.

[4]     NDL's corporate representative has classified Peacock's duties as "administrative" and admits that revenue accounting is an administrative service. Dkt. # 85-2, at 11, 13.

H&P is a working interest owner in approximately 320 to 330 wells.  Dkt. # 85-2, at 4.  The summary judgment record is silent as to the total amount of "PRSA Mtnc Fees" NDL has actually charged to H&P, but H&P disputes the propriety of NDL charging fees in accordance with the fee schedule, Dkt. # 85, at 11, as well as NDL's calculations under the fee schedule, even if it were applicable.

In addition to charging H&P for PRSA maintenance fees, NDL charges overhead fees on a fixed rate basis pursuant to the parties' contracts, as set forth below.  See infra Part I.C.  H&P argues that the parties' contracts preclude NDL from charging PRSA maintenance fees, because the contracts' overhead provisions account for the administrative costs associated with revenue disbursement.  Dkt. # 85, at 23.  H&P contends that the PRSA was not intended to supplant private agreements that assume duties associated with royalty remittance, and asserts that NDL has breached the parties' contracts by charging for both overhead and PRSA maintenance fees.  Id. at 24.  NDL counters that the overhead provisions in the parties' contracts do not account for administrative costs associated with revenue disbursement, and that it is permitted to charge PRSA maintenance fees pursuant to the aforementioned statutory provisions.  Dkt. # 88, at 5-6.  The summary judgment record is silent as to the total amount of overhead NDL has charged to H&P.  See, e.g., Dkt. # 85-9, at 1.

### C.      Relevant contractual agreements

The five participation agreements and their respectively attached and incorporated joint operating agreements (JOAs) govern the parties' relationship and obligations to each other.[5]  The respective agreements are summarized and restated, in relevant parts, as follows:

#### 1.      Eight East Project

Both parties have stipulated that NDL has improperly charged PRSA maintenance fees under the Eight East Amended Participation Agreement, which contains the following clause:

> Nothing in this Participation Agreement shall be construed to mean that the Joint Operating Agreement and the COPAS Accounting Procedures attached to the Joint Operating Agreement do not constitute a 'written agreement' within the meaning of the Oklahoma Production Revenue Standards Act, Section 570.1-15, Title 52 of the Oklahoma Statutes and regulations promulgated pursuant thereto and codified at OCC Rule 165:10-27-1.

Dkt. # 69-1, at 30.  NDL stipulated that "NDL has, on occasion, inadvertently passed PRSA fees on to certain of its working-interest owners under the Eight East PA.  NDL does not dispute that these charges were made and that they are not allowed under the Eight East PA.  Indeed, NDL's corporate representative [] admitted as much in his January 18, 2023, deposition." Dkt. # 80, at 5.  H&P agrees that NDL cannot charge PRSA fees under the Eight East Project participation agreement.  Dkt. # 85, at 10.

---

[5]      A more comprehensive summary of the contractual agreements may be found in the Court's prior opinion.  See Dkt. # 90, at 6-21.

## 2. Boomtown Project, Luther Project, Golden Lane Project[6]

The Boomtown, Luther, and Golden Lane project participation agreements are silent with respect to the PRSA; however, they incorporate the same provision of the model form JOA describing royalty disbursement. The JOA has an attached exhibit, "Accounting Procedure," which defines terms, outlines billing and audit procedures, sets overhead rates, and describes charges that can be made by NDL. Article XVI Other Provisions contains a provision outlining royalty remittance:

> B. Disbursement of Royalties: If a purchaser of any oil, gas or other hydrocarbons produced from the Contract Area declines to make disbursements of all royalties, overriding royalties, working interests and other payments out of or with respect to production revenues which are payable on the Contract Area, Operator may, at its option, from time to time, make disbursements on behalf of any Non-Operator who requests in writing that Operator do so. Each Non-Operator for whom such disbursement is made shall furnish Operator with the following:
>
> > 1. Such documents as may be necessary in the opinion of Operator to enable Operator to receive all payments for oil, gas, or other hydrocarbons directly from the purchaser thereof.
> >
> > 2. An initial list of names, addresses and interests (to a seven-place decimal) on a tract, unit, purchase contract or other such basis as, in the opinion of Operator, is necessary for efficient administration, for all royalty, overriding royalty, and other interest owners who are entitled to proceeds from the sale of production attributable to such Non-Operator's interest. Also, any changes to the initial list shall be furnished promptly to Operator in writing.
>
> Operator will use its best efforts to make disbursements correctly, but will be liable for incorrect disbursement only in the event of gross negligence or willful misconduct. Any Non-Operator for whom such disbursements are made hereby agrees to indemnify and hold harmless Operator for any loss, including court costs

---

[6] The original parties–including NDL and H&P's predecessor in interest–to the Boomtown Participation Agreement entered into the contract on September 28, 2007. Dkt. # 85, at 12. The original parties to the Luther Project entered into the JOA on August 12, 2011. Id. The original parties to the Golden Lane Participation Agreement entered into the contract on January 10, 2007. Id.

and attorneys' fees which may be incurred as a result of Operator's making such disbursements in the manner prescribed by Non-Operator.

Dkt. # 69-2, at 47 (emphasis added); Dkt. # 69-4, at 56 (emphasis added); Dkt. # 69-5, at 33

(emphasis added). The summary judgment record does not reflect that H&P or its predecessor in

interest furnished written documentation to NDL to request disbursements.

The projects' contracts also have a provision in the Accounting Procedure, Section III.

Overhead, 1. Overhead – Drilling and Producing Operations, which defines overhead costs:

As compensation for administrative, supervision, office services, and warehousing costs, Operator shall charge drilling and producing operations on either:

(X) Fixed Rate Basis, Paragraph l.A.; or,

( ) Percentage Basis, Paragraph l.B.

Unless otherwise agreed to by the Parties, this charge shall be in lieu of costs and expenses of all offices and salaries, or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3.A., Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting, or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III., unless the cost and expense are agreed to be the Parties as a direct charge to the Joint Account.

Dkt. # 69-4, at 71-72; Dkt. # 69-5, at 49-50; Dkt. # 69-2, at 61-62. Finally, the Accounting

Procedure, II. Direct Charges authorizes NDL to charge the Joint Account with:

15. Other Expenditures
Any other expenditure not covered or dealt with in the foregoing provisions of this Section II., or in Section III., and which is of direct benefit to the Joint Property, and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

Dkt. # 69-2, at 61; Dkt. # 69-4, at 71; Dkt. # 69-5, 49.

### 3. Paden Project

The Paden project participation agreement also incorporates a model form JOA, attached as

"Exhibit F."  The participation agreement is silent with respect to the PRSA.  However, similar to

the aforementioned contracts, the JOA's "Accounting Procedure" outlines the parties' disbursement

of royalties.  Article XVI Other Provisions contains the following provision:

> Disbursement of Royalties and Production Proceeds
>
> Operator shall make disbursements of all royalties, overriding royalties and other
> payments for production of oil, gas or other hydrocarbons on behalf of said
> Non-Operator for disbursement, provided, Non-Operator shall execute such
> documents as may be necessary in the opinion of Operator to enable Operator to
> receive all payments for oil, gas or other hydrocarbons directly from said purchaser.
> In that event, Operator shall use its best efforts to make disbursements correctly but
> shall be liable for incorrect disbursement only in the event of gross negligence or
> willful misconduct.

Dkt. # 69-6, at 23 (emphasis added).  The Paden Accounting Procedure also defines overhead costs

for drilling and producing operations:

> As compensation for administrative, supervision, office services, and warehousing
> costs, Operator shall charge drilling and producing operations on either:
>
> (X) Fixed Rate Basis, Paragraph 1.4.;or,
>
> ( ) Percentage Basis, Paragraph 1.8.
>
> Unless otherwise agreed to by the Parties, this charge shall be in lieu of costs and
> expenses of all offices and salaries, or wages plus applicable burdens and expenses
> of all personnel, except those directly chargeable under Paragraph 3.4., Section II.
> The cost and expense of services from outside sources in connection with matters of
> taxation, traffic, accounting, or matters before or involving governmental agencies
> shall be considered as included in the overhead rates provided for in the above
> selected Paragraph of this Section III., unless the cost and expense are agreed to be
> the Parties as a direct charge to the Joint Account.

Dkt. # 69-6, at 33.  Finally, the Accounting Procedure, II. Direct Charges authorizes NDL

to charge the Joint Account with:

> 15. Other Expenditures
> Any other expenditure not covered or dealt with in the foregoing provisions of this
> Section II., or in Section III., and which is of direct benefit to the Joint Property, and
> is incurred by the Operator in the necessary and proper conduct of the Joint
> Operations.

Dkt. # 69-6, at 33.

### 4.    NDL's gas purchase agreement with ScissorTail and disbursement of working interest royalties

Prior to 2012, NDL outsourced revenue accounting and royalty disbursement services on

behalf of its working-interest owners to ScissorTail Energy, LLC ("ScissorTail"), its gas purchaser.

This was done pursuant to a 2005 gas purchase and processing contract between NDL and

ScissorTail.  Dkt. # 85-8.  The 2005 contract required ScissorTail to remit payment of the proceeds

from the sale of the committed gas to the interest holders, and was initially termed for a period of

fifteen years.  Dkt. # 85, at 14-15; Dkt. # 80, at 10.  NDL and ScissorTail then amended their

agreement on December 1, 2012, such that ScissorTail now remits payment to NDL for all proceeds

from the purchase of committed gas.  Dkt. # 85-7, at 3.  The amended agreement designates NDL as

solely responsible for distributions to working interest owners.  Id. at 11.

The Golden Lane and Boomtown participation agreements, executed before 2012, expressly

ratify NDL's original existing gas purchasing and processing agreement.  Dkt. # 80, at 10.  The

Luther JOA does not mention the ScissorTail gas purchasing agreement.  The Eight East Amended

PA and the Paden PA, executed in 2014, do not mention the ScissorTail original or amended

agreement.

Since 2012, NDL has made disbursement of all working interest, royalties, overriding royalties, and other payments out of or with respect to production revenues.  Dkt. # 85, at 14; Dkt. # 88, at 3.  NDL has performed royalty disbursement and revenue accounting services for the duration of H&P's contractual relationship with NDL.

### D.      Prior litigation

Beginning in 2016, various working interest owners–not including H&P or its predecessor in interest– filed a petition for declaratory judgment in state court against NDL and others to declare the parties' rights and obligations under the Golden Lane, Paden, and Luther Agreements, and determine whether Okla. Stat. Ann. tit. 52, § 570.13 (West 1992) and Okla. Admin. Code § 165:10-27-10 promulgated thereunder, authorized NDL to charge administrative fees. Dkt. # 85-10; Dkt. # 85, at 17; Dkt. # 88, at 4.  On November 1, 2017, and January 11, 2018, the Oklahoma County District Court entered one-page orders granting the motions for partial summary disposition under the PRSA in favor of those plaintiffs and against defendant NDL.  The November 1, 2017, order states:

> [NDL] has breached the Golden Lane, Southern Dome and Paden Participation Agreements by charging these Plaintiffs PRSA fees pursuant to [Okla. Admin. Code § 165:10-27-10].  .  .  .  The Court also enters a declaratory judgment that the Agreements do not authorize PRSA fees to be charged.

Dkt. # 85-20, at 1.  The January 11, 2018, order states:

> [NDL] has breached the [Luther Agreement] by charging [plaintiffs] fees pursuant to [Okla. Admin. Code § 165:10-27-10].  .  .  .  The Court also enters a declaratory judgment that the [Luther Agreement] does not authorize PRSA fees to be charged.

Dkt. # 85-21, at 1-2.  After entry of these orders, the litigation between the parties continued on other issues.  NDL continued charging PRSA fees to H&P–which was not a party to the above litigation–

10

after entry of the orders.  Dkt. # 85, at 20; Dkt. # 88, at 28.  On December 6, 2022, the parties in that litigation reached a settlement and dismissed the cases without prejudice.  The state court orders were not reversed or vacated as part of that settlement or dismissal.  Dkt. # 85-10.

## II.

### A.    Standard of Review

"A motion for partial summary judgment is resolved under the same standard as a motion for summary judgment." Doshay v. Glob. Credit Collection Corp., 796 F. Supp. 2d 1301, 1303 (D. Colo. 2011) (citing Franklin v. Thompson, 981 F.2d 1168, 1169 (10th Cir. 1992)).  Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 317.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment.  Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be

11

insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

An action for declaratory relief is appropriate to resolve contract disputes between parties. "'In order to invoke the jurisdiction of the court under the declaratory judgments act there must be an actual, existing justiciable controversy between parties having opposing interests, which interests must be direct and substantial, and involve an actual, as distinguished from a possible, potential, or contingent dispute.'" Bristow First Assembly of God v. BP p.l.c., 210 F. Supp. 3d 1284, 1290 (N.D. Okla. 2016) (quoting Dean v. State of Okla. ex rel. Doak, 292 P.3d 58, 62 (Okla. Civ. App. 2012) (internal quotations omitted)).

**B.      NDL objection to H&P's combined response and cross-motion for summary judgment**

In its reply, NDL asserts that H&P's combined response and cross-motion for summary judgment is not permitted under local rule LCvR7(b).[7] Dkt. # 88, at 4. NDL advanced this same argument in its motion for partial summary judgment on earthquake litigation expenses. Dkt. # 87. The Court has addressed the issue in its recent opinion and order, and applies that same reasoning here. Dkt. # 90. The Court considers H&P's response both a response and a proper cross-motion for partial summary judgment. Dkt. # 90, at 25-27.

---

[7]      LCvR7(b) provides that "[i]t is not acceptable to file any combination of motion, response, reply, or supplemental brief."

## III.

### A.      The doctrine of collateral estoppel does not bar this issue from litigation

H&P argues that NDL's prior litigation with other working interest owners on two of the same contracts precludes re-litigation under the doctrine of collateral estoppel.  Dkt. # 85, at 26. "The doctrine of collateral estoppel, or issue preclusion, is activated when an ultimate issue has been determined by a valid and final judgment—that question cannot be relitigated by parties, or their privies, to the prior adjudication in any future lawsuit." Carris v. John R. Thomas & Assocs., P.C., 896 P.2d 522, 527 (Okla. 1995).  Collateral estoppel requires that the prior action was "finally adjudicated on the merits." Matosantos Commercial Corp. v. Applebee's Int'l, Inc., 245 F.3d 1203, 1207 (10th Cir. 2001).  Orders granting partial summary judgment are generally not final appealable orders for purposes of collateral estoppel.  See Trujillo v. Rio Arriba Cnty. ex rel. Rio Arriba Cnty. Sheriff's Dep't, 319 F.R.D. 571, 639-40 (D.N.M. 2016).  Additionally, "a consensual settlement is generally not a final judgment for the purposes of collateral estoppel." Boswell v. Colloid Env't Techs. Co., 236 F.R.D. 682, 690 (D. Wyo. 2006), aff'd, 215 F. App'x 771 (10th Cir. 2007)[8].

Assuming, arguendo, that the state court considered the same contracts and ultimate issues, it is nevertheless impossible for this Court to determine whether that action was adjudicated on the merits.  The state court's grant of partial summary disposition was issued in two one-page orders with no reasoning.  Additionally, the case ultimately settled, foreclosing the parties' opportunity to appeal the state court's decision.  The state court's orders consequently do not present a "final judgment" with preclusive effects under the doctrine of collateral estoppel.

---

[8]      This and other cited unpublished decisions are not precedential, but may be cited for their persuasive value. 10th Cir. R. 32.1(A).

**B.    The parties' contracts are "private agreements" under the PRSA and account for revenue disbursement and associated administrative fees**

**1.    Statutory interpretation of the PRSA**

A determination of the propriety of NDL's "PRSA Mtnc" charges requires an examination of the statutory language of the PRSA. "'Legislative intent controls statutory interpretation.'" Cline v. Sunoco, Inc., 479 F. Supp. 3d 1148, 1170 (E.D. Okla. 2020) (quoting H.B. Krug v. Helmerich & Payne, Inc., 362 P.3d 205, 210 (Okla. 2015)). Intent may be derived from the language of the pertinent statute and the act as a whole. Id. "Relevant provisions must be considered together whenever possible to give full force and effect to each." Krug, 362 P.3d at 210-11. The statute's "terms are given their plain and ordinary meaning." Id. at 211.

The PRSA regulates the marketing, sale, and production of oil and gas in the state of Oklahoma. Dkt. # 85, at 21; Okla. Stat. Ann. tit. 52, § 570.1, et seq. (West 1992). "The obvious overriding purpose of the PRSA is to ensure that royalty owners are timely paid their share of the proceeds." Cline, 479 F. Supp. 3d at 1170. The PRSA creates mechanisms for timely royalty accounting and remittance, and prevents operators from neglecting to pay timely proceeds to royalty owners when taking advantage of high interest rates. Okla. Stat. Ann. tit. 52, § 570.1, et seq. (West 1992). In exchange for managing royalty remittance, the operator of wells can offset administrative costs by assessing fees to working interest owners. Subsection 13 of the PRSA provides that:

> The Corporation Commission shall promulgate rules, as needed, in furtherance of the purposes of the Production Revenue Standards Act, including but not limited to a schedule of equitable fees and expense reimbursements from working interest owners sufficient to cover the actual costs incurred by the operator to perform duties required by the Production Revenue Standards Act not assumed by private agreement.

Okla. Stat. Ann. tit. 52, § 570.13 (West 1992) (emphasis added).

14

The Corporation Commission is an Oklahoma regulatory agency that engages in rulemaking to further the "public policy and statutory laws of the State of Oklahoma to prevent the waste of oil and gas, to assure the greatest ultimate recovery from the State's reservoirs, to protect the correlative rights of all interest owners, and to prevent pollution."   Okla. Admin. Code § 165:10-1-1. Subchapter 27 of the administrative code "implements the [PRSA] and shall apply to all producing wells as set forth in the [PRSA]." Okla. Admin. Code § 165:10-27-1.  It "is intended to supplement and clarify as needed the language in the statutes."  Id.  Section 10 of this PRSA subchapter "prescribes fees which may be charged by the operator of a gas producing well [] for administrative expenses generated by the Production Revenue Standards Act."  Okla. Admin. Code. § 165: 10-27-10(a).  Subsection (e) declares that:

> [a]n annual maintenance fee shall cover any cost associated with record keeping, issuance of gas balancing statements and any election of a producing owner regarding separate distribution of royalty proceeds. Maintenance fees shall be calculated on an annual basis using the first day of May as the anniversary date. Such fees may be prorated and billed on a monthly basis at the well operator's discretion. If a well has a date of first production after the first day of May of the calendar year, the annual maintenance fee shall be prorated based on the remaining number of months before the next anniversary date on the first day of May.

Okla. Admin. Code 165:10-27-10(e).  Subsection (g) iterates that the "rates for implementation fees and annual maintenance fees shall be based on the appropriate table values found in Appendix G to this Chapter, subject to annual adjustments as provided below."   Okla. Admin. Code. § 165:10 Appendix G.

NDL argues that the plain language of Okla. Stat. Ann. tit. 52, § 570.13 (West 1992) mandates that "where the costs to perform the PRSA duties are not assumed by private agreement, PRSA fees may be charged."  Dkt. # 88, at 1.  H&P, citing the same statute, argues that "[w]here

royalty remittance is assumed by private agreement among all owners in the well, the operator cannot charge a PRSA fee." Dkt. # 85, at 6. H&P further asserts that "NDL's obligations to disburse revenue arise from the agreements[;] therefore its obligation is contractual, not statutory, and recordkeeping fees or annual maintenance fees associated with distribution of proceeds set by the PRSA in OAC 165:10-27-10 are inapplicable." Dkt. # 85, at 22.

A plain reading of § 570.13 reveals that private agreements that assume actual costs –including equitable fees and expense reimbursements from working interest owners– incurred by the operator to perform PRSA duties are not subject to the Corporation Commission's rules. Other PRSA sections support this plain reading; section 570.3–prescribing the application of the PRSA–states "that Sections 4, 5, 6, 7, and 8 of the [PRSA] shall not apply . . . where royalty remittance is otherwise provided by written agreement among all owners in a well." Okla. Stat. Ann. tit. 52, § 570.3 (West 1992). It is apparent that the PRSA was not intended to supersede private agreements that contemplate royalty remittance and associated costs. This is logical; parties who have contemplated revenue disbursement and associated administrative fees are already comporting with obligations set forth by the PRSA. The promulgated rules under the Oklahoma Administrative Code are set forth to ensure only that the operator and working interest owners have statutory recourse in the event their contracts do not account for costs associated with PRSA duties. Where those costs are accounted for, there is no obligation to follow the Corporation Commission's fee schedule.

An operator may not charge additional fees pursuant to Okla. Admin. Code § 165:10-27-10 where contracts between working interest owners and operators account for administrative expenses associated with royalty remittance and revenue disbursement. The Court must therefore examine

16

the language of the parties' contracts and determine whether they provide for administrative expenses associated with royalty disbursement.

> **2.     The parties' contracts account for administrative expenses associated with royalty disbursements**

"The JOA is a contract to be construed like any other agreement." Pitco Prod. Co. v. Chaparral Energy, Inc., 63 P.3d 541, 545 (Okla. 2003).  Under Oklahoma law,[9] "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Okla. Stat. tit. 15, § 154.  "A contract must be considered as a whole so as to give effect to all its provisions without narrowly concentrating upon some clause or language taken out of context." Lewis v. Sac & Fox Tribe of Okla. Housing Auth., 896 P.2d 503, 514 (Okla. 1994). "The terms of the parties' contract, if unambiguous, clear, and consistent, are accepted in their plain and ordinary sense, and the contract will be enforced to carry out the intention of the parties as it existed at the time the contract was negotiated." Dodson v. St. Paul Ins. Co., 812 P.2d 372, 376 (Okla. 1991); see also Okla. Stat. tit. 15, § 160.  "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . ." Okla. Stat. tit. 15, § 155. "Interpretation of contracts, and whether they are ambiguous, are matters of law for the court to determine." Livesay v. Shoreline, LLC, 331 P.3d 1067, 1070 (Okla. Civ. App. 2001) (citing Osprey LLC v. Kelley Moore Paint Co., 984 P.2d 194 (Okla 1999)).

The parties disagree as to whether the contracts provide for costs associated with royalty remittance.  NDL argues that, because three of the contracts give NDL the option–but not the obligation–to disburse working interest owner royalties, it is the PRSA that requires NDL to disburse

---

[9]     Each of the aforementioned contracts contains an Oklahoma choice of law provision.

working interest owner revenues. NDL further argues that all of the contracts, including the Paden JOA (though underline obligating NDL to disburse interest royalties), fail to account for the associated administrative costs. H&P counters that the "option" language of the contracts does not matter; NDL elected to disburse royalties under all of the parties' agreements. H&P contends that all of the contracts charge H&P a fixed rate overhead that accounts for administrative expenses incurred by NDL for royalty remittance. H&P argues that NDL has essentially double-charged H&P for revenue accounting and royalty disbursement services.

First, the contracts plainly contemplate royalty disbursement and associated administrative costs. Each contract contains an explicit "Disbursement of Royalties" clause. Three of the agreements–the Golden Lane, Boomtown, and Luther JOAs– allow NDL, as operator, to make disbursements of royalties upon request of the working interest owners. That these three contracts provide only the option and not the obligation for NDL to disburse royalties is irrelevant; NDL has elected to disburse royalties for wells under each of the contracts since 2012.[10] H&P was not a party

---

[10]     NDL began disbursing royalties when it modified its gas purchasing agreement with ScissorTail, in 2012, to assume sole responsibility for all revenue distributions. NDL argues that because the Boomtown, Golden Lane, and Luther contracts were all negotiated and executed before the ScissorTail amendment, the parties did not contemplate that NDL "would handle the added work and expenses associated with revenue accounting and royalty disbursement services on behalf of the working-interest owners." Dkt. # 80, at 10. NDL points to the obligatory language in the Eight East and Paden agreements, executed after the ScissorTail amendment, as proof that the parties had never intended to have NDL disburse royalties.

As an initial matter, the obligatory language in the Eight East and Paden agreements has no bearing on the interpretation of the Boomtown, Golden Lane, and Luther contracts. See infra Part III.B.3. Second, only the Boomtown and Golden Lane contracts ratify the ScissorTail agreement. The Luther participation agreement does not mention the ScissorTail agreement. Finally, while the Boomtown and Golden Lane contracts ratify the original ScissorTail agreement,   H&P did not become a successor in interest to the contracts until 2017, five

(continued...)

to the contracts until 2017, and NDL has disbursed royalties for H&P for the entire duration of the parties' contractual relationship.

NDL's argument that there must be some additional "royalty disbursement agreement"–separate from the parties' five contracts–is unsupported by law and the language of the contracts. First, the PRSA makes no such requirement; the statute simply provides that the Corporation Commission may create rules–including the equitable fee schedule–when a private agreement does not assume actual costs incurred by the operator. The parties' five contracts are "private agreements" between the parties. Second, the "Disbursement of Royalties" clause present in three of the contracts provides not only administrative procedures for non-operators to request disbursement, but also terms for operator liability in the event NDL makes incorrect disbursements. See, e.g., Dkt. # 69-2, at 47. Moreover, the Paden JOA requires NDL to disburse royalties on behalf of its working interest owners. NDL's contention that the parties' contracts require a separate private agreement to specifically address the disbursement of royalties is devoid of supporting contractual language. It is not apparent why a separate "royalty disbursement agreement" would be necessary, especially since, as the Court finds below, the contracts' overhead provisions account for the administrative costs associated with royalty disbursement. It is apparent that the parties' contracts account for royalty remittance, and that NDL elected to disburse revenues pursuant to the agreements.

Analysis of the royalty disbursement clause aside, the contracts' overhead provisions plainly encompass NDL's costs associated with revenue disbursement. NDL argues that the administration

---

[10]     (...continued)
         years after the amendment to the ScissorTail agreement took place. Additionally, all five of the contracts contemplate the disbursement of royalties and provide terms for NDL to disburse royalties.

and maintenance of the royalty decks, carried out by LaDonna Peacock, are not "producing operations" and are therefore not covered by the overhead provision.  This is an inexact interpretation of the plain language of the overhead provision.  The provision states that NDL shall charge drilling and producing operations on a fixed rate basis "as compensation for administrative, supervision, office services, and warehousing costs."  The same provision continues: "[u]nless otherwise agreed to by the [p]arties, this charge shall be in lieu of costs and expenses of all offices and salaries, or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3.A, Section II.[11]  Additionally, the fixed rate provided in the contract "shall be in lieu of costs and expenses of salaries of all personnel."  Peacock is responsible for maintaining the revenue decks and disbursing royalties[12] and NDL agrees that these services are her sole responsibility.  NDL has classified her job, and the work of two employees who assist her, as administrative.  NDL's corporate representative admitted that her revenue accounting services can be characterized as the "push of a button."  It logically follows that revenue disbursement is an administrative cost under the contracts.  The overhead provision provides that NDL shall charge

---

[11]     Paragraph 3.A, Section II is a provision of the contracts that allows NDL to charge H&P directly for "[s]alaries and wages of operator's field employees directly employed on the Joint Property in the conduct of Joint Operators; salaries of First Level Supervisors in the field; Salaries and wages of Technical Employees directly employed on the Joint Property if the charges are excluded from the overhead rates; Salaries and wages of Technical Employees, either temporarily or permanently, assigned to and directly employed in the operation of the Joint Property if the charges are excluded from the overhead rates."  See, e.g., Dkt. # 69-2, at 59.  NDL's corporate representative has confirmed that LaDonna Peacock is not a field employee, technical employee, or first level supervisor. See Dkt. # 85, at 9; Dkt. # 85-2, at 11.

[12]     NDL has admitted that "a lot of revenue accounting is pushing a button on here, is how much is attributable to this well [] [a]nd if your deck is maintained properly it splits it out for you." Dkt. # 85-2, at 15.

producing operations on a fixed rate basis as compensation for administrative costs.  This section of the contract is unambiguous; the administrative costs associated with revenue disbursement–incurred by NDL through the payment of Peacock's salary–is accounted for by the overhead provision of the contract.[13]

NDL has alleged facts about the "great expense NDL was forced to carry to handle revenue disbursements," including that it had to "implement an entire department" made up of "six or seven people," but it is not apparent how or why this should impact H&P.  H&P became a party to the contracts in 2017, and since that time, Peacock is the only full-time employee who handles revenue disbursement.  Moreover, NDL elected to disburse royalties pursuant to the parties' contracts and its separate gas-purchase agreement, and voluntarily entered the Paden agreement obligating it to disburse royalties.  It is not apparent to the Court how the PRSA–enacted in 1992, and pre-dating the contracts by at least fifteen years–suddenly required NDL to incur "great expense."  NDL chose to disburse royalties under the contracts, employed Peacock to handle this administrative task, and accounted for her salary in the fixed rate overhead.  Charging "PRSA Mtnc" fees in addition to the overhead rate is superfluous with respect to the <u>actual</u> costs incurred by NDL.

The Court finds that the terms of the contracts are clear and unambiguous; costs associated with the maintenance and administration of royalty disbursement are accounted for in the contracts'

---

[13]     NDL may not charge "PRSA Mtnc" fees under the "Other Expenditures" section of II. Direct Charges, because such costs are "covered" by Section III Overhead.  See supra Part I.C.2.

overhead provisions.[14]  The Corporation Commission rules and fee schedule promulgated under the

PRSA do not apply where costs incurred by the operator to perform PRSA duties are assumed by

private agreement.

### 3. Extrinsic evidence may not be considered when the contract terms are clear and unambiguous

NDL supports many of its arguments by relying on evidence from the Eight East Amended

Participation Agreement and the Council of Petroleum Accountants Societies ("COPAS") Model

Form Interpretation ("MFI").  Neither bears relevance to the interpretation of the parties' contracts.[15]

---

[14]  The Court need not consider NDL's arguments pertaining to the "Interests of Parties in Costs and Production" section of the JOAs because it finds that the administrative costs associated with revenue accounting and royalty disbursement are expressly accounted for under the contract documents.  See Dkt. # 80, at 16.

[15]  NDL contends that the MFI of the "1984 Accounting Procedure Joint Operations," published in 1985, should guide the Court's interpretation of "administrative costs" as defined in the overhead provision.  The MFI was drafted to "explain, interpret and elaborate on the provisions of the COPAS - 1984 Onshore Accounting Procedure"–after which the parties' contracts are modeled.  When elaborating on the overhead provision, the MFI states:

> [a]dministrative costs applicable to development and production operations include the overhead of the related facility operations, such as gas systems and plants, salt water disposal systems, additional recovery systems, etc. [] Administrative overhead costs of downstream operations, such as refinery, sales, oil and gas transportation, oil purchases and sales, manufacturing and other operations not directly associated with producing operations should not be included in administrative costs.

Dkt. # 80, at 52.  However, this MFI was published in 1985: seven years before the enactment of the PRSA, fifteen years prior to the Golden Lane Agreement, and more than twenty years prior to the Paden agreement.  Dkt. # 85, at 25; Dkt. # 80, at 35.

The other COPAS forms published after the PRSA support an opposite conclusion.  For example, the MFI for "Overhead Principles," published in 2002, states that "indirect costs is synonymous with the term 'overhead' and should be recovered by the [o]perator through the agreed upon Overhead rate."  It then states indirect costs include "administration" which
(continued...)

"Under Oklahoma law, if the language of a contract 'is unambiguous, its language is the only legitimate evidence of what the parties intended.'" In re Oklahoma Plaza Invs., Ltd., 203 B.R. 479, 481 (N.D. Okla. 1994) (quoting Ollie v. Rainbolt, 669 P.2d 275, 279 (Okla.1983)). "The parties' intent cannot be determined from the surrounding circumstances, but must be gathered from the words used." Id. at 482.  The clause expressly prohibiting the charge of PRSA fees in the Eight East Amended PA,[16] a separate contract, does not impact the interpretation of the Golden Lane, Boomtown, Luther and Paden agreements.  Likewise, the COPAS MFIs and negotiation guidelines

---

[15]    (...continued)
encompasses "accounting," and "data processing."  Dkt. # 80, at 64.  Moreover, the "Overhead Rate Negotiation and Calculation" accounting guideline, published in 2001, includes a dedicated section expressing how "production/revenue accounting" should be negotiated for when determining the overhead rate.  Dkt. # 80, at 103.  The guidelines state that for "fee royalty payments" and "royalty owner inquiries," "one [p]arty may be designated to pay or purchaser may pay."  Id.  It then notes that "if [o]perator pays for others, compensation [is] due – either direct or overhead."  These guidelines were published well before the parties entered into their agreements, and support the conclusion that overhead provisions may include administrative costs associated with royalty disbursement.

[16]    It is not apparent how failing to include the Eight East Amended PA clause would lead the Court to draw the inference that the other contracts were not intended to be private agreements as contemplated by the PRSA. The Eight East clause states:

> [n]othing in this Participation Agreement shall be construed to mean that the Joint Operating Agreement and the COPAS Accounting Procedures attached to the Joint Operating Agreement do not constitute a 'written agreement' within the meaning of the Oklahoma Production Revenue Standards Act, Section 570.1-15, Title 52 of the Oklahoma Statutes and regulations promulgated pursuant thereto and codified at OAC Rule 165:10-27-1.

Dkt. # 69-1, at 30 (emphasis added).  This provision affirms, if anything, that the incorporated JOAs were intended to be construed as private agreements and that no amendment to the participation agreement would alter that original understanding.  Just because the other written agreements do not expressly state that they shall not be construed as not constituting a "written agreement" does not negate the fact that each is in fact a "written agreement."

are extrinsic evidence that cannot be considered when, as it has here, the Court has found that the language of the contracts is clear and unambiguous.  The Court has found that the Golden Lane, Boomtown, Luther, and Paden contracts plainly contemplate revenue accounting and royalty disbursement, and provide for a fixed overhead fee that accounts for NDL's administrative costs. The Eight East Amended PA and the COPAS guidelines are irrelevant.

## IV.

The Court finds and concludes as a matter of law that NDL may not charge maintenance fees pursuant to the PRSA and Okla. Admin. Code § 165:10-27-10, because the contracts' overhead provisions cover  administrative expenses associated with royalty remittance and revenue disbursement.  The Court concludes that the contracts are unambiguous; the language of the contracts is clear and explicit, and the parties' intent plainly ascertainable.  Accepted in their plain and ordinary sense, the terms of the participation agreements provide that administrative costs resulting from producing operations, such as royalty remittance, are accounted for in the fixed overhead rate.  It is clear that the PRSA does not permit an operator to charge working interest owners a statutory maintenance fee when the parties' contracts allow the operator to recover administrative costs.  The Court concludes that NDL may not charge H&P additional maintenance fees under the PRSA.

NDL's motion for partial summary judgment as to the propriety of the PRSA fees should be denied, and H&P's cross-motion for partial summary judgment as to the impropriety of the  PRSA fees should be granted.  The Court declares that damages should be awarded to H&P in the full amount of the charged PRSA fees.  The parties shall confer in an attempt to resolve the amount of such recovery, plus interest.

**IT IS THEREFORE ORDERED** that plaintiff/consolidated defendant NDL's motion for partial summary judgment on PRSA fees (Dkt. # 80) is **denied**.

**IT IS FURTHER ORDERED** that defendant/consolidated plaintiff H&P's cross motion for partial summary judgment on PRSA fees contained within its response (Dkt. # 85) is **granted**.

**IT IS FURTHER ORDERED** that the parties shall file a joint chart of the PRSA fees charged to H&P no later than **May 31, 2024.**

**DATED** this 4th day of March, 2024.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE