**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **NEW DOMINION, LLC,** | ) | |
| | ) | |
| **Plaintiff/Consolidated** | ) | **Case No. 20-CV-00592-CVE-CDL** |
| **Defendant,** | ) | **BASE FILE** |
| | ) | |
| **v.** | ) | **(Consolidated with:** |
| | ) | **Case No. 21-CV-0504-CVE-CDL)** |
| **H&P INVESTMENTS, LLC,** | ) | |
| | ) | |
| **Defendant/Consolidated** | ) | |
| **Plaintiff.** | ) | |

**OPINION AND ORDER**

Before the Court are cross motions for partial summary judgment by plaintiff/consolidated defendant New Dominion, LLC (NDL) (Dkt. # 138) and defendant/consolidated plaintiff H&P Investments, LLC (H&P) (Dkt. # 140). The Court granted H&P's previous motion for partial summary judgment, awarding damages to H&P on its breach of contract claim for improperly charged fees, pursuant to Oklahoma's statutory scheme regulating the marketing, sale, and production of oil and gas, known as the Oklahoma Production Revenue Standards Act (PRSA), OKLA. STAT., tit. 52, § 570.1, et seq. (1992). Dkt. # 95, at 1.[1] Thereafter, the parties sought leave to brief three issues for resolution prior to trial, which are: (1) whether H&P may recover interest on improperly charged PRSA fees, pursuant to OKLA. STAT. tit. 52, § 570.10, and whether the parties' joint operating agreements (JOAs) and/or Council of Petroleum Accountants Societies (COPAS) provisions, requiring a showing of willful misconduct or gross negligence on the part of NDL, limits the OKLA. STAT. tit. 52, § 570.10 recovery; (2) whether H&P's claim for breach of contract is subject to a five-

---

[1] The issues in this opinion and order deal solely with breach of contract claim with respect to the PRSA fees, as the court has previously ruled on the breach of contract issues with respect to earthquake litigation legal expenses. See Dkt. # 90.

year statute of limitations under the PRSA rather than the two-year contractual notice requirement found in the JOAs and COPAS provisions; and (3) whether a settlement agreement reached in a related bankruptcy proceeding in Delaware, In re: New Source Energy Partners, L.P., No. 16-10642 (Bankr. D. Del. Apr. 9, 2018), precludes H&P's claim for reimbursement of improperly charged PRSA fees prior to April 2018.  Dkt. # 136, at 1-2; Dkt. # 137, at 1-2. NDL moved for partial summary judgment on these three remaining issues (Dkt. # 138), and H&P cross-moved for partial summary judgment (Dkt. # 140).

## I.

The Court finds the following facts are undisputed in the summary judgment record[2]:

The underlying dispute arises from a 2014 lawsuit, in which NDL was sued by Oklahoma landowners, alleging that NDL's injection of wastewater into saltwater disposal wells had caused earthquakes in and around Oklahoma.  Dkt. # 90, at 2-3.  Between 2007 and 2014, NDL entered into five agreements with New Source Energy Partners, LP and New Source Energy GP, LLC ("New Source"), in which New Source acquired a working interest in oil and gas leases, which contained saltwater disposal wells that were later identified as the source of the earthquakes.  Dkt. # 78-19, at 1-2; Dkt. # 90, at 3-4.  As the Court has previously discussed, the five agreements, comprised of participation agreements and associated JOAs for the leases, governed the participants' relationship and obligations to each other.  Dkt. # 90, at 7; Dkt. # 95, at 5.  Included in those agreements were a COPAS form, a standard form that guides the accounting procedures in conducting joint operations as determined by the JOAs.  Dkt. # 138, ¶ 2; Dkt. # 140, ¶ 2.  In 2017, New Source sold its working

---

[2]   The Court also incorporates and adopts the undisputed facts set forth in its two previous Opinions and Orders (Dkt. ## 90, 95) without restating them in full here.

interest in those five leases to H&P via bankruptcy sale order.  Dkt. # 78-19, at 5; Dkt. # 83, at 5; Dkt. # 90, at  2.  H&P and NDL did not enter into any new participation or joint operating agreements following the acquisition.  Dkt. # 90, at 2.  In 2018, NDL and H&P entered into a settlement agreement as a result of the bankruptcy sale from New Source, in a Delaware bankruptcy proceeding. In re: New Source Energy Partners, L.P., No. 16-BK-10642, (Bankr. D. Del. Apr. 9, 2018), Dkt. # 231; see also Dkt. # 138-2.

On October 9, 2020, H&P sent a letter to NDL, stating that it took "exception to and contest[ed] certain costs and expenses that NDL ha[d] been billing H&P with respect to H&P's interests in the [five] wells . . . ."  Dkt. # 138-3, at 1.  H&P identified as one of the challenged costs and expenses that "NDL's monthly billings to H&P include a charge for a 'PRSA fee,'" which H&P had understood as "covered by the applicable JOA overhead charge fee," and which rendered the charge of a separate PRSA fee impermissible.[3]  Id.  On October 21, 2020, NDL filed a petition in Tulsa County District Court, seeking a declaratory judgment as to whether NDL had permissibly charged H&P monthly costs and expenses for the wells, pursuant to the parties' agreements.  Dkt. # 2, at 6-7.  H&P properly removed the action to this Court on the basis of diversity jurisdiction.  Dkt. # 2, at 1.

NDL moved for and the Court granted its request to bifurcate its declaratory judgment claims into issues related to the terms of the contracts and issue related to damages.  Dkt. # 63; Dkt. # 76. NDL then moved for partial summary judgment as to whether H&P had a contractual obligation to

---

[3]    In this letter, H&P objected to NDL charging six costs and fees, including PRSA fees, legal charges related to the earthquake litigation, charges by "affiliated entities" that were unidentified, costs related to saltwater disposal that had increased without a stated rationale, overhead for inactive wells that contravened the parties' agreements, and severance taxes that were incorrectly charged.  Dkt. # 138-3, at 1-2.

pay legal expenses, one of the challenged costs and expenses identified in the letter, arising out of NDL's defense and prosecution of third-party earthquake and insurance litigation. See Dkt. # 90, at 1. The Court concluded that, based on the unambiguous language of the five agreements between the parties, the agreements do not permit NDL to charge H&P for the legal expenses arising out of its earthquake and insurance litigation. Id. at 36.[4] NDL also moved for partial summary judgment as to whether NDL had properly charged H&P maintenance fees it had incurred, as provided for in the PRSA. Dkt. # 95, at 1. The Court found that by the clear and unambiguous language of the contracts between the parties, the contracts and not the PRSA control the allotment of costs associated with the maintenance and administration of royalty disbursements. Dkt. # 95, at 21-22. Therefore, NDL cannot charge H&P additional maintenance fees under the PRSA, and it awarded damages to H&P for the PRSA fees already charged, plus interest. Id. at 24. Following the Court's ruling, the parties began parsing the PRSA fees that NDL had previously charged, and they were able to narrow the disputed fees and interest due thereupon. Dkt. # 105, at 1. NDL and H&P agreed on the fees charged during the undisputed period between January 2019 (corresponding with production month November 2018) and April 2024 (corresponding with production month February 2024), totaling $535,478.93. Id. at 1, 3.

The parties have raised a number of disputed facts, Dkt. # 140, at 7-11; Dkt. # 147, at 3-5, that the Court finds not material to the issues before it, which are: (1) whether NDL is liable for statutory interest on the PRSA fees it improperly charged H&P, and if so, (2) whether the parties'

---

[4]    NDL moved for the Court to reconsider this opinion, stating that new events had occurred, producing new evidence that demonstrated the validity of NDL's position. Dkt. # 120. The Court found that NDL's so-called "new evidence" was both immaterial and failed to establish clear error or manifest injustice arising out of the Court's opinion. Dkt. # 134, at 8. As a result, it denied NDL's motion to reconsider. Id. at 10.

joint operating agreements limit H&P's right to recover statutory interest, and/or (3) whether the parties' settlement agreement abrogates H&P's entitlement to statutory interest. Id. at 1-2; Dkt. # 136, at 1-2.[5] NDL has moved for partial summary judgment (Dkt. # 138) as to these issues, to which H&P responded and cross-moved for partial summary judgment on the same issues (Dkt. # 140). NDL submitted a combined reply and response to H&P's motion (Dkt. # 147), and H&P submitted a combined reply and response to NDL's motion (Dkt. # 150). The motions are now ripe for review.

## II.

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). On a motion for partial summary judgment, just like a motion for summary judgment, it is the movant's burden to demonstrate the absence of a genuine issue of material fact and an entitlement to judgment as a matter of law. Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. The Court's inquiry, in essence, is "whether the evidence presents a sufficient

---

[5]    H&P states that NDL continues to charge H&P PRSA fees, despite repeated objections. Dkt. # 140, at 14. NDL counters that H&P has been awarded a credit for certain of the unintentional, improper charges. Dkt. # 147, at 4.

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  The Court must make its determination, construing the record in the light most favorable to the party opposing summary judgment.  Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

**III.**

NDL argues that it is entitled to partial summary judgment on three grounds.  First, it asserts that H&P may not recover for production revenues not paid by NDL to H&P because, taken together, the JOAs, participation agreements, and COPAS provisions require H&P to show that NDL engaged in willful misconduct or gross negligence in order to be entitled to unpaid production revenues, and H&P has not made such a showing.  Dkt. # 138, at 10.  Second, NDL claims that H&P's breach of contract claim is abrogated by H&P's failure to provide sufficient notice of the claim, as required by the parties' agreements.  Id. at 16.  Specifically, it claims any letters H&P sent to NDL during the period at issue are insufficiently detailed and specific to comprise notice of a claim.  Id. at 17-18. Third, NDL states that H&P has waived all claims that arose prior to 2018 because the settlement agreement reached in In re: New Source Energy Partners, L.P., No. 16-BK-10642 (Bankr. D. Del. Apr. 9, 2018), Dkt. # 231, precludes any claim for reimbursement for charges predating April 2018. Id. at 18-19.  Finally, the approved settlement in In re: New Source Energy Partners, L.P. similarly applies to all relevant JOAs prior to March 12, 2018, meaning H&P would have waived its claims under the settlement agreement.  Id. at 19.

H&P responds and moves for partial summary judgment on the same three grounds.  Dkt. # 140.  H&P argues first that its entitlement to interest arises under the PRSA and not the parties' agreements, and the PRSA does not necessitate a showing of willfulness or gross negligence.  Id. at

15.  Even if the parties' agreements are operative, H&P asserts that NPL has acted with gross negligence, at a minimum.  Id. at 15-16.  Second, H&P asserts that the five-year statute of limitations under the PRSA is operative, unhindered by any contractual notice requirement found in the JOAs or COPAs provisions.  Id. at 16.  And even if the JOA or COPAS limitations were operative, H&P argues that NDL has waived any claim on this issue by paying wrongfully charged legal expenses dating back to July 2017.  Id.  Third, H&P argues that the settlement agreement reached in In re: New Source Energy Partners, L.P. was limited in scope and does not apply to the claims at issue.  Id.  H&P asserts that even if the settlement agreement could be read to include the claims here, NDL again waived its argument on this issue by paying earthquake litigation legal expenses dating back to July 2017.  Id.

**A.  Whether H&P Must Show that NDL Engaged in Gross Negligence or Willful Misconduct In Order to Be Entitled to Interest on Erroneously Charged PRSA Fees**

NDL first asserts that H&P's entitlement to PRSA interest on production revenues is governed by the parties' agreements, comprised of the JOAs, participation agreements, and COPAS provisions.  Dkt. # 138, at 10.  By NDL's reading of those contractual agreements, in order for H&P to recover PRSA interest on production revenue that was not paid to H&P (by virtue of improperly withheld PRSA maintenance fees), H&P must show that NDL engaged in willful misconduct or gross negligence.  Id. at 10, 12 nn.7-8.  H&P responds that no aspect of the parties' agreements addresses the manner in which proceeds from the sale of production are to be shared with owners, which allows the PRSA to fill the gap in the parties' agreement.  Dkt. # 140, at 15, 17.  As H&P interprets it, the PRSA provides that interest automatically accrues on wrongfully withheld proceeds, notwithstanding any other agreement between the parties.  Id. at 18.  H&P reads the language of the parties'

7

participation agreements requiring a showing of "gross negligence or willful misconduct," as inapplicable in this context. Id. at 18-19 (quoting Dkt. # 69-4, at 56). At issue is whether the parties' contractual agreements provide for this situation, whereby interest on erroneously charged PRSA fees requires a showing of willful misconduct or gross negligence, or whether the parties' contractual agreements are silent as to this situation and the PRSA fills such a void, obligating NDL to pay all proceeds and interest within the statutorily allotted time, regardless of the reason for or manner in which the original payments were made. The Court begins by examining the plain language of the contractual agreements between the parties.

"In Oklahoma, as in most jurisdictions, the paramount objective of contract interpretation is to effectuate the intent of the parties as expressed by the terms of the contract." Walker v. Builddirect.com Techs. Inc., 349 P.3d 549, 552 (Okla. 2015) (citing Currey v. Willard Steam Serv. Inc., 321 P.2d 680, 685 (Okla. 1958)); see OKLA. STAT. tit. 15, § 155. "If the terms of the contract are clear, consistent, and unambiguous, they are accepted in their ordinary sense." Crown Energy Co. v. Mid-Cont'l Cas. Co., 511 P.3d 1064, 1068 (Okla. 2022) (citing Dodson v. St. Paul. Ins. Co., 812 P.2d 372, 376)); see OKLA. STAT. tit. 15, § 154. NDL asks the Court to examine the language of two JOA provisions as dispositive on this issue. Dkt. # 138, at 11; Dkt. # 147, at 5-6. Under Oklahoma law, a "JOA is a contract and is to be interpreted according to general contract principles," such that if "the language of the JOA is unambiguous, the court is to interpret it as a matter of law." McCall v. Chesapeake Energy Co., 164 P.3d 1120, 1125 (Okla. 2007) (citing Pitco Prod. Co. v. Chaparral Energy, Inc., 63 P.3d 541, 544 (Okla. 2003)). The mere fact of a disagreement between parties as to construction does not render contractual language ambiguous. Pitco, 63 P.3d at 545.

First, NDL asserts that JOA article XVI, "Other Provisions," section B, titled "Disbursement

of Royalties," governs the issue at hand. Dkt. ## 69-2, at 47; 69-4, at 56; 69-5, at 33. NDL specifically points to JOA language that reads: "Operator will use its best efforts to make disbursements correctly, but will be liable for incorrect disbursement only in the event of gross negligence or willful misconduct." Dkt. # 138, at 12 (citing Dkt. ## 69-2, at 47; 69-4, at 56; 69-5, at 33). While this sentence, in isolation, might seem unambiguous and dispositive as to the issue of whether liability for improperly withheld disbursements requires a showing of gross negligence or willful misconduct, when read in context, a plain reading of this subsection controverts NDL's assertion entirely. Pitco, 63 P.3d 541, n. 34 (quoting Dodson, 812 P.2d at 376-77) ("Neither a forced nor strained construction will be indulged, nor will any provision be taken out of context and narrowly focused upon to create and then construe an ambiguity so as to import a more favorable consideration to either party than that expressed in the contract."); Lewis v. Sac & Fox Tribe of Okla. Housing Auth., 896 P.2d 503, 514 (Okla. 1994) ("A contract must be considered as a whole so as to give effect to all its provisions without narrowly concentrating upon some clause or language taken out of context."). As H&P points out, this subsection repeatedly refers to "royalty disbursement" or "royalty remittance" made by an operator "on behalf of any non-operator." Dkt. ## 69-2, at 47; 69-4, at 56; 69-5, at 33. This section and the discussion of the standard for liability for incorrect disbursement addresses NDL's responsibility to non-operators who request royalty disbursement on their behalf, not to H&P, with which NDL has a direct, contractual relationship and knows H&P's identity and the full extent of its ownership interest. Dkt. # 140, at 18. H&P argues that NDL has an obligation to pay H&P its contractual share of proceeds and therefore this provision is inapplicable. Id.

To read the provision in context, the Court considers the full text of the section:

**B. Disbursement of Royalties:**

> If a purchaser of any oil, gas or other hydrocarbons produced from the Contract Area declines to make disbursements of all royalties, overriding royalties, working interests and other payments out of or with respect to production revenues which are payable on the Contract Area, Operator may, at its option, from time to time, make disbursements on behalf of any Non-Operator who requests in writing that Operator do so.  Each Non-Operator for whom such disbursement is made shall furnish Operator with the following:

> 1.      Such documents as may be necessary in the opinion of Operator to enable Operator to receive all payments for oil, gas or other hydrocarbons directly from the purchaser thereof.

> 2.      An initial list of names, addresses and interests (to a seven-place decimal) on a tract, unit, purchase contract or other such basis as, in the opinion of Operator, is necessary for efficient administration, for all royalty, overriding royalty and other interest owners who are entitled to proceeds from the sale of production attributable to such Non-Operator's interest. Also, any changes to the initial list shall be furnished promptly to Operator in writing.

> Operator will use its best efforts to make disbursements correctly, but will be liable for incorrect disbursement only in the event of gross negligence or willful misconduct.  Any Non-Operator for whom such disbursements are made hereby agrees to indemnify and hold harmless Operator for any loss, including court costs and attorneys' fees which may be incurred as a result of Operator's making such disbursements in the manner prescribed by Non-Operator.

Dkt. # 69-2, at 47; 69-4, at 56; 69-5, at 33.  In the sentence immediately preceding the one quoted by

NDL (the sentence related to "gross negligence or willful misconduct"), the language requires that

each "non-operator for whom . . . disbursement is made shall furnish Operator with" a list of "names,

addresses and interests," as well as a basis on which the operator may conclude the non-operator is

entitled to proceeds attributable to its interest.  Id.  As applied to non-operators with whom the

operator has no contractual relationship, such information might be helpful and even necessary to

identify the entities to whom royalty disbursements are payable, especially since, as H&P argues,

errors in disbursements would be likelier to occur more in the absence of a clear contractual

relationship. Dkt. # 140, at 18. In that context, in the absence of a contractual or lease-based relationship, a heightened required showing of willful misconduct or gross negligence, as compared to the PRSA's standard, would be appropriate. Id. If the Court were to adopt NDL's interpretation of this subsection, the sentence following the one NDL quoted also lacks meaning. The final sentence of the subsection requires non-operators to indemnify the operator for any loss incurred as a result of the operator making incorrect disbursements. Dkt. ## 69-2, at 47; 69-4, at 56; 69-5, at 33. In other words, H&P would be required to indemnify NDL for its costs and fees arising out of NDL making incorrect disbursements to H&P. Under Oklahoma law, the "whole of the contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others." OKLA. STAT. tit. 15, § 157. Giving effect to the section as a whole rather than reading one sentence in isolation, as NDL argues the Court should, the Court finds the language that requires a showing of "gross negligence or willful misconduct" in JOA article XVI, subsection B, inapplicable to H&P.

Second, NDL asserts that JOA article V, "Operator," section A, titled "Designation and Responsibilities of Operator," also imposes a requirement of showing gross negligence or willful misconduct. Dkt. # 138, at 12 & n. 8. That provision reads:

**A. Designation and Responsibilities of Operator**

> New Dominion, L.L.C. ("NDL") shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this Agreement. The Parties acknowledge that NDL is not a working interest owner in the Contract Area. In its performance of services under this Agreement for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this Agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party.

> Operator shall conduct its activities under this Agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except as may result from gross negligence or willful misconduct.

Dkt. ## 69-2, at 23-24; 69-4, at 32-33; 69-5, at 9-10.  NDL characterizes this section as a list of unrelated provisions, grouped together under the general topic of NDL's responsibilities as the operator to the working interest partners.  Dkt. # 147, at 6.  It is in this isolated context that NDL asks the Court to read the excerpt quoted, which requires a finding of "gross negligence or willful misconduct" for losses sustained or liabilities incurred, in order for liability to attach.

H&P, by contrast, characterizes this section as relating to NDL's role as a contractor in the oilfield, including in drilling and extraction.  Dkt. # 150, at 6.  In support of its reading, H&P cites to Shell Rocky Mountain Production, LLC v. Ultra Resources, Inc., 415 F.3d 1158 (10th Cir. 2005), in which the Tenth Circuit examined identical language in a different contract, under Article V, as it related to the standard for breach.  In that case, the Tenth Circuit held that the same exculpatory language did not bar a counterclaim for breach of the parties' JOAs.  Id. at 1171.  It concluded that, although the language of the contract did provide for a showing of "gross negligence or willful misconduct" was not applicable to "'administrative duties' that do[] not 'involve extraordinary risks.'"  Id.  (quoting Gary B. Conine, The Prudent Operator Standard: Applications Beyond the Oil and Gas Lease, NAT. RESOURCES J. Winter 2021, at 68 n.168).  It went on: "While a higher standard for breach might apply to drilling, extraction, and other risky 'operations' because most operators have the same incentive as non-operators to do well in physical operations, it is nonsensical to apply such a standard to administrative and accounting duties where the operator can profit by cheating, or simply overcharging, its working interest owners."  Id.

Following the Tenth Circuit's ruling in <u>Shell Rocky Mountain Productions</u>, the Court finds that this provision has no bearing on the showing required to merit entitlement to interest on the impermissibly charged PRSA fees. This provision, as H&P suggests, relates to NDL's obligations as an operator and independent contractor specifically in the field. This is evinced by the surrounding provisions that relate to carrying out its responsibilities in "good workmanlike manner" and which require "good oilfield practice." Both the text of the subsection and the title, "Designation and Responsibilities of Operator," make plain that this section relates to NDL's role and responsibilities as an operator and as an independent contractor with respect to those non-operators in the fields, not with regard to the administration of its fees or its distribution of revenue and obligations to H&P. To read this section as a "conglomerate listing of multiple separate responsibilities" that all pertain to NDL contorts the obvious meaning of the paragraph. Dkt. # 147, at 6. This provision does not limit H&P's entitlement to recovery of improperly charged PRSA fees or of statutory interest owed thereupon. The Court finds that neither of these two JOA provisions applies to the statutory interest owed on the PRSA fees that were improperly charged to H&P.

On this issue, NDL finally argues that under the PRSA, and specifically the provision that concerns statutory interest, there is no mention of recovery on "erroneously charged" PRSA fees. Dkt. # 138 at 10. NDL attempts to characterize these fees as "prejudgment interest," asserting that prejudgment interest is generally not awarded under the PRSA. <u>Id.</u> The Court has previously determined that the parties' contractual agreements did not permit NDL to charge "PRSA Mtnc" fees, which derived from H&P's share of production revenue. Dkt. # 95, at 24-25. Although H&P's cause of action derives from NDL's breach of contract, the PRSA provides for the remedy, which in this case is set out in the PRSA, under OKLA. STAT. tit. 52, § 570.10(D)(1), providing that "where

proceeds from the sale of oil or gas production or some portion of such proceeds are not paid prior to the end of the applicable time periods provided in this section, that portion not timely paid shall earn interest at the rate of twelve percent (12%) per annum to be compounded annually, calculated from the end of the month in which such production is sold until the day paid." This provision may not explicitly mention recovery on "erroneously charged" PRSA fees, but it does provide that interest accrues on wrongfully withheld proceeds, obviating any need for a showing of gross negligence or willful misconduct. The statute's text supports the award of statutory interest with respect to improperly charged PRSA fees, and as such the Court grants H&P's motion for partial summary judgment as to the first issue, and denies NDL's motion for partial summary judgment on that issue. The Court now turns to NDL's arguments as to the limits of H&P's claim for improperly charged PRSA fees.

**B.  Whether H&P's Claims Are Abrogated by Contractual Provisions that Require Notice of a Claim and Limit Recovery to Two Years**

The next issue is whether H&P's breach of contract claim is governed by a five year statute of limitations, which would allow H&P to recover damages for fees that were improperly charged as early as July 2017, or whether the claim is subject to a COPAS provision that requires notice of a dispute within two years of the charge, which would require sufficient written notice of the claim and prevent H&P from recovering damages from improperly charged fees more than two years before that notice. The parties agree that their relationship is governed by Oklahoma law, and that under Oklahoma law, both a breach of contract claim and an action brought pursuant to the PRSA are governed by a five-year statute of limitations, from the date the cause of action has accrued. See Dkt. # 138, at 16 (citing OKLA. STAT. tit. 52, § 570.14); Dkt. # 140, at 22-23 (citing OKLA. STAT. tit. 52,

§ 570.14(D)(1); OKLA. STAT. tit. 12, § 95(A)(1)).  To date, the Court has found that, based on the plain language of the parties' contractual agreements and on the fact that the PRSA does not permit an operator to charge working interest owners a statutory maintenance fee, NDL is not permitted to charge H&P additional maintenance fees under the PRSA.  Dkt. # 95, at 24.  The PRSA further sets out that damages for improperly charged fees, are subject to a statutory interest rate "of twelve percent (12%) per annum, compounded annually, calculated from the end of the month in which such production is sold until the day paid."  OKLA. STAT. tit. 52, § 570.10.

At issue here is NDL's assertion that the parties' JOAs and incorporated COPAS provisions abrogate the five-year statute of limitations.  Dkt. # 138, at 16.  NDL argues that the JOAs and COPAS provisions require that sufficient written exception be made within a twenty-four month period after a disputed charge, or else it is waived.  Id.  Because of this, H&P would be limited to seeking statutory interest on PRSA fees charged from January 1, 2019, the last billing period that ended twenty-four months before H&P asserted its counterclaims, on November 30, 2020.  See Dkt. # 14.  NDL's argument rests on the language of the 2005 COPAS form—a standardized form used by the Council of Petroleum Accountants Societies to standardize accounting procedures in the oil and gas industry surrounding billing, joint accounting operations, and audits—which was incorporated into the agreements at issue here.  Id. (citing Dkt. # 69-1, at 104; Dkt. # 69-4, at 68).  Id. at 18.  NDL relies on article I, section 4 of the JOAs, entitled "Adjustments," of the accounting procedure, which concerns billing practices.  As H&P points out, the improperly charged fees at issue here were withheld proceeds that were otherwise payable to H&P not, as NDL attempts to suggest, joint interest bills that required payment from H&P or required exception within the twenty-four month period.  See Dkt. # 140, at 23-24.  Even more fundamentally, the type of billing contemplated

by this provision, which is elaborated upon further in article II of the agreement, principally concerns

billing for categories such as ecological and environmental costs, lease rentals and royalties (paid by

the owner for the joint operations), labor, employee benefits, material, transportation, services,

equipment and facilities.  Id. at 24 (citing Dkt. # 69-4, at 69-71).  Those categories have in common

that they are permissible expenses found within the scope of basic overhead required for drilling,

exploration, and production.  In other words, article I, section 4 cannot be read to encompass

disbursement of revenues or the fees associated with disbursement of revenue, and therefore does not

apply to the improperly charged PRSA fees at issue here.[6]  Because the COPAS provision that NDL

cites is inapplicable, the Court need not address whether H&P provided sufficient written exception

at anytime before the five year statute of limitation accrued.

In the absence of any germane contractual provision, the applicable statute of limitations,

whether analyzed under the PRSA statutory provision or under Oklahoma contract law, is five years

from the time the cause of action accrued.  See OKLA. STAT. tit. 52, § 570.14(D); OKLA. STAT. tit.

12, § 95(A)(1).  Under Oklahoma law, the PRSA does not create a statutory claim, but rather sets

forth the remedy that follows once a party has breached its obligation to pay proceeds.  Hebble v.

---

[6]    H&P cites to Meridian Oil Production, Inc. v. Universal Reservation Corp., 978 F.2d 1267
(10th Cir. 1992) (unreported table decision), for the proposition that the Tenth Circuit has
applied the Oklahoma statute of limitations for written contracts in a case of breach of a joint
operating agreement, rather than applying a COPAS provision.  Dkt. # 140, at 21-22.  As
NDL underscores, in Meridian, the parties agreed that the claims were governed by
Oklahoma's contractual statute of limitations, and the only discussion of a COPAS provision
concerned a different provision from a different form.  Dkt. # 147, at 9 n.9.  There, the issue
before the Court was whether the statute of limitations could be tolled by written exception,
as required by the COPAS audit procedure.  Meridian, 978 F.2d at *3.  Here, the Court need
not rely on Meridian to make its findings, since it concludes that the COPAS provision NDL
invokes is inapplicable to the dispute at hand and, therefore, the Court need not address
issues related to whether H&P provided sufficient written notice.

Shell W. E & P, Inc., 238 P.3d 939, 945 (Okla. Civ. App. 2009) ("The PRSA does not create a statutory claim. Rather, it imposes standards for the treatment of proceeds from the sale of oil and gas production." (citations omitted)); Purcell v. Santa Fe Minerals, Inc., 961 P.2d 188, 191-94 (Okla. 1998) ("The 12% [PRSA statutory] interest is based upon a breach of the obligation to pay the royalty arising *ex contractu* in the manner prescribed by [OKLA. STAT. tit. 52,] § 540."); see also Dkt. # 138, at 10; Dkt. # 140, at 23. Section 570.14(D) sets out that "the statute of limitations on actions brought pursuant to the provisions of the [PRSA] shall be five (5) years from the date the cause of action shall have accrued . . . ." The PRSA neither includes nor is subject to any notice provision in order for the action to accrue. Similarly, Oklahoma law limits any action predicated "upon any contract, agreement, or promise in writing" to be commenced "[w]ithin five (5) years." OKLA. STAT. tit. 12, § 95(A)(1). Regardless of whether the Court applies the statute of limitations for breach of contract or the statute of limitations in the PRSA—in other words, regardless of whether the substantive rights invoked "arise out of the contract, common law, or statute"—the statute of limitations is five years from the accrual of the action. Purcell, 961 P.2d at 192.[7] H&P filed its answer and counterclaims on November 30, 2020, in which it first alleged that NDL had deprived it of proceeds to which it was legally entitled contrary to the PRSA.[8] Dkt. # 14, ¶¶ 15-17. Accordingly, H&P's entitlement to

---

[7]   H&P also argues that NDL waived its argument on this issue by paying H&P the legal expenses that it had wrongfully charged following the Court's order granting partial summary judgment to H&P as to the issue of legal expenses (Dkt. # 90). Dkt. # 140, at 25. H&P argues that the wrongfully charged legal expenses were identical in nature to the PRSA fees and therefore NDL has waived any argument as to the statute of limitations. Id. It is unnecessary for the Court to make a determination as to whether NDL waived this argument, as NDL's argument on this point is unavailing and any subsequent waiver issue is moot.

[8]   The parties disagree as to whether the assertion of a counterclaim is sufficient written exception to trigger the COPAS provision. Compare Dkt. # 138, at 17 (citing Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1414 (5th Cir. 1993) for the proposition that

statutory interest on the improperly charged PRSA fees begins in July 2017, when H&P purchased its interest in the wells and NDL began to wrongfully charge PRSA fees to the joint account. Dkt. # 140, ¶ 1; Dkt. # 147, ¶ 1.

## C. Whether H&P's Claims Prior to 2018 Are Precluded by a Settlement Agreement Reached in In Re: New Source Energy Partners, L.P.

Lastly, NDL moves for summary judgment on the ground that H&P's claims for reimbursement of and interest on PRSA fees improperly charged are limited by a settlement agreement the parties reached in the bankruptcy proceeding, In re: New Source Energy Partners, L.P., No. 16-BK-10642, (Bankr. Apr. 9 2018), Dkt. # 231. NDL argues that in the settlement agreement, which NDL and H&P entered into with the Chapter 7 Trustee of New Source, releases and discharges NDL "from any and all claims, obligations, costs, causes of action, losses, and financial damages they may have against" NDL related to:

> (i) the collection of revenues related to the Sold Assets and Setoffs of operating expenses related to the Sold Assets from the Sale Effective Time to the Settlement Effective Date; (ii) the collection of revenues related to the Southern Dome Assets and Setoffs of operating expenses related to the Southern Dome Assets from the revenues of the Sold Assets from the Sale Effective Time to the Settlement Effective Date; and (iii) the collection of revenues related to the Stray Well Assets and Setoffs of operating expenses related to the Stray Well Assets from the revenues of the Sold Assets from the Sale Effective Time to the Settlement Effective Date provided that the foregoing release shall not limit nor be deemed to limit the rights of the H&P Releasing Parties to enforce this Agreement in accordance with its terms or any other right with respect [to] any Sold Assets after the Sale Closing Date; provided further that NDL shall not set off any Southern Dome Asset expenses or Stray Wells Asset expenses against the Sold Assets revenues from March 1, 2018 to the Settlement Effective Date.

---

the Fifth Circuit has found that a counterclaim did not constitute sufficient written exception under the COPAS provision at issue), with Dkt. # 140, at 23 (distinguishing the case with the facts at issue here, as the Fifth Circuit analyzed contractual claims, interpreting the audit provision as a contractual bar to reexamining joint interest billings). The Court does not reach a conclusion as to what constitutes sufficient written exception under this COPAS provision, as it finds the provision inapplicable here.

Dkt. # 138-2, at 8 (emphases in original).  NDL argues that H&P has waived all claims related to the wells at issue, which arose prior to March 12, 2018, the date on which the settlement agreement was entered.  Dkt. # 138, 18-19; Dkt. # 147, at 11-12; Dkt. # 138-2, at 4.  However, to read the language of the quoted paragraph as absolving NDL of its responsibility to pay interest owed on wrongfully charged PRSA fees goes against both the plain language and purpose of the agreement.

First, by the language of the agreement, H&P releases NDL as to "the collection of revenues related to the Sold Assets and Setoffs of operating expenses related to the Sold Assets from the Effective Sale Time to the Settlement Effective Date."  Dkt. # 138-2, at 8.  H&P asks the Court to examine how "Setoffs" is defined in the agreement, which reads:

> WHEREAS the Trustee and NDL entered into a Stipulation that was approved by the Bankruptcy Court at Docket No. 67, wherein NDL submitted monthly accountings (the "Accountings") to the Trustee and was authorized to setoff certain operating expenses it incurred against certain revenues owed to the Estates (the "Setoffs") as adequate protection for an alleged lien and setoff rights asserted by NDL over the revenues of certain Estate assets to secure payment of certain operating expenses incurred by NDL . . . ."

Id. at 5.  In other words, the setoffs of operating expenses to which H&P released its rights in the agreement are those operating expenses NDL incurred against revenues "owed to the Estates," not to H&P.  H&P distinguishes itself from "the Estates" discussed in this provision, given that each entity has a separate release of NDL, discussed in entirely separate paragraphs.  See Dkt. # 138-2, at 7; id. at 8.  Whereas the Estate has its own terms of release, H&P specifically reserved "any other right with respect to the Sold Assets," which encompasses the improperly charged PRSA fees at issue here.  Id.  When these provisions are read together, the Court can conclude that H&P's agreement concerns setoffs of revenues owed to the Estates, not those owed to H&P, and moreover it distinctly reserves for H&P the right to pursue these claims.

This reading is supported by language found elsewhere in the agreement.  In H&P's release

paragraph, the parties agree to release NDL from all claims by H&P related to "Disputed Revenues."

Dkt. # 138-2, at 7.  In relevant part, the agreement as to H&P's resolution of Disputed Revenues

reads:

> 4.    Resolution of Cure Cost Dispute and Disputed Revenues.  Upon the Settlement Effective Date and all claims, causes of action or disputes in any way related to the Cure Cost Dispute and/or the Disputed Revenues shall be deemed fully resolved and released by and amongst the Parties.  H&P and the Trustee further agree that the H&P Payment constitutes a purchase price adjustment from $10,000,000 to $9,325,000 as called for under the APA and each of H&P and the Trustee agree that the other has no additional monetary obligations under the APA.  H&P and the Trustee further agree that of the adjusted $9,325,000 purchase price, $4,662,500 is allocable to leaseholds and $4.662,500 is allocable to tangible assets.

Id.  Contemplated by this provision, and in turn by the adjusted purchase price, are "Disputed

Revenues," which are defined as "any and all net income, proceeds, receipts, and credits earned with

respect to the Sold Assets, Southern Dome Assets and Stray Well Assets for the period from the Sale

Effective Time through and including the Sale Closing Date, after setoff of NDL's legitimate

operating expenses related to the Sold Assets, Southern Dome Assets and Stray Well Assets for such

time period."  Id. at 5 n.4.  Operative here is the caveat that the revenues the settlement agreement

pertains to are "legitimate operating expenses."   Despite NDL's repeated argument that PRSA fees

were permissibly charged and therefore are legitimate operating expenses, the Court has decided this

issue and found the PRSA fees to be improper.  Dkt. # 147, at 12; see Dkt. # 95, at 24.  Therefore,

"legitimate operating expenses" cannot be interpreted to include the improperly charged PRSA fees.

Second, beyond the language of the settlement agreement, the settlement agreement's purpose

supports the conclusion that H&P did not waive all claims against NDL prior to 2018.[9]  The settlement agreement's purpose was to resolve outstanding issues between New Source and NDL, such that H&P did not inherit unresolved historical disputes.  Given the language before it, the Court cannot read the settlement agreement as a release of H&P's claims for all future breaches, including for restitution of improperly charged fees and interest thereupon.[10]  The settlement agreement reached by NDL and H&P in the New Source bankruptcy proceeding is clear and does not preclude H&P's claim for reimbursement for improperly charged PRSA fees prior to April 2018.

**IV.**

The Court finds and concludes as a matter of law that H&P's entitlement to PRSA statutory interest is not affected by the parties' agreements and therefore recovery of the interest owed does not require a showing of gross negligence or willful misconduct.  As the parties' agreements do not contain germane language on this issue, the PRSA applies, obligating NDL to pay damages in the

---

[9]     The parties disagree as to the time span to which the settlement agreement applies.  H&P argues that the agreement can apply only to July through September of 2017 because the Sale Effective Term is defined by the agreement as April 1, 2017, and the Sale Closing Date is again defined by the agreement as July 20, 2017.  Dkt. # 140, at 26 (citing Dkt. # 138-2, at 4).  By contrast, NDL argues that the Sale Effective date is the beginning of the period at issue, but the Settlement Effective Date, which was defined as the "first business day after the Bankruptcy Court order approving th[e] Agreement bec[ame] final and non-appealable," and would have been April 10, 2018, is the operative end-date.  Dkt. # 147, at 11 n.12. (citing Dkt. 138-2, at 6).  Because the Court does not find that the settlement agreement constitutes waiver, it need not reach a determination as to which dates are operative.

[10]    H&P also raises the issue of waiver, in that the Court granted H&P partial summary judgment as to the fact that NDL improperly charged H&P legal expenses related to the earthquake litigation, which it was required to reimburse.  Dkt. # 140, at 27-28.  H&P argues that because NDL paid the improperly charged legal expenses without addressing the effects of the settlement agreement, it has waived its argument as to this agreement's effect on the improperly charged PRSA fees.  Id.  The Court does not address H&P's argument as to NDL's waiver, as the underlying issue, of whether the settlement agreement limits H&P's ability to recover, is dispositive.

form of 12% interest, as required by § 570.10, without any further showing of gross negligence or willful misconduct. Moreover, H&P's entitlement is not limited by a COPAS provision integrated into the JOAs that requires specific detailed written exception for a claim within a twenty-four month period after the charge is made. The Court concludes that the COPAS provision to which NDL cites has no bearing on the type of fees at issue here and therefore does not abrogate H&P's claim. Instead, the statute of limitations in Oklahoma for breach of contract and in the PRSA apply, allowing H&P to recover up to five years of statutory interest, which as applied here would date back to July 2017. Finally, the settlement agreement reached between the parties and the Chapter 7 Trustee for New Source does not limit H&P's ability to recover wrongfully charged PRSA fees. The language of the agreement cannot be reasonably read to apply to impermissibly charged fees. H&P is therefore entitled to reimbursement and interest upon improperly charged PRSA fees dating back to July 2017, when it purchased its interest in the wells at issue.

**IT IS THEREFORE ORDERED** that plaintiff/consolidated defendant NDL's motion for partial summary judgment on remaining issues (Dkt. # 138) is **denied**.

**IT IS FURTHER ORDERED** that defendant/consolidated plaintiff H&P's cross motion for partial summary judgment on remaining issues (Dkt. # 140) is **granted**.

**IT IS FURTHER ORDERED** that the parties shall file, **no later than July 17, 2026**, a joint chart of PRSA fees, described as "PRSA Mtnc," that were impermissibly charged and withheld, including the amounts charged and PRSA interest due, from July 2017 to the present.

**DATED** this 11th day of June, 2026.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

22